# ILLINOIS OFFICIAL REPORTS

---

### *People v. Null*, 2013 IL App (2d) 110189

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON W. NULL, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0189 |
| Filed | June 20, 2013 |
| Rehearing denied | July 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and sentence for the first-degree murder of his wife were upheld over his contentions that the trial court erred in admitting evidence of his prior acts of domestic violence and that the 50-year sentence was excessive, since the evidence of defendant's prior acts was properly admitted to show defendant's intent, motive, and lack of mistake, and the sentence was not an abuse of discretion, especially in view of the evidence that defendant's violent conduct continued, despite the opportunities he was given to change. |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 08-CF-121; the Hon. Fernando L. Engelsma, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Thomas A. Lilien and R. Christopher White, both of State Appellate Defender's Office, of Elgin, for appellant. |
|---|---|
| | Michelle J. Courier, State's Attorney, of Belvidere (Lawrence M. Bauer and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion. Justices Jorgensen and Hudson concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Aaron W. Null, was convicted by a jury of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2002)) for the November 2002 killing of his wife Brynn Null. The trial court sentenced defendant to 50 years in the Illinois Department of Corrections. Defendant timely appealed, arguing that the trial court abused its discretion in admitting evidence of prior acts of domestic violence and in sentencing defendant to 50 years' imprisonment. For the following reasons we reject both arguments and affirm defendant's conviction and sentence.

¶ 2                                   I. BACKGROUND

¶ 3    Defendant was charged by indictment on March 28, 2008, with the offense of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2002)). In the indictment the State alleged that on or about November 17, 2002, defendant "struck Brynn Null in and about the body with an object, knowing such act created a strong probability of great bodily harm to Brynn Null, thereby causing the death of Brynn Null, in violation of 720 ILCS 5/9-1(a)(2) (West 2002)." Brynn Null's body has never been found.

¶ 4    Prior to trial defendant filed several motions. The trial court denied defendant's motion to suppress his 2002 statements to the police and his motion to quash a search warrant. It also granted in part and denied in part defendant's motion *in limine* to exclude evidence of prior "domestic discord." The State argued that it was offering the other-crimes evidence to give the fact finder an opportunity to understand "their relationship and the hostilities between the two of them." During the hearing, the State proceeded by way of proffer, submitting to the trial court 10 exhibits that included police reports, petitions for orders of protection, and Brynn's petition for dissolution of marriage, which had been dismissed before Brynn's disappearance. The trial court barred testimony of police officers regarding Brynn's statements to them concerning her allegations of abuse, finding that the statements were testimonial and therefore not admissible under *Crawford v. Washington*, 541 U.S. 36 (2004).

However, the trial court allowed into evidence the officers' testimony concerning their observations of Brynn's injuries and photographs of same. The court next considered Brynn's written statements in two petitions for orders of protection. In a September 5, 2001, petition, Brynn alleged that defendant choked her. She alleged that "[t]his is the second time he's done this. He gets mad at me and breaks things around the house." She alleged that she made a police report but that the police were not able to arrest defendant at his home. In a January 4, 2002, petition, Brynn alleged that on January 2, 2002, she and defendant got into an argument after she picked him up from work. She alleged that:

> "We get home and he started hitting me. Then he kept me locked in the house all night. The next day he threatened me with a baseball bat, told me he had to put me in my place, told me I deserved it, and told me he could make me disappear. Then when he left, I called the police and made out a report and they arrested him."

The trial court ruled that these statements were not admissible, because they were prepared in anticipation of court proceedings and were therefore testimonial.[1]

¶ 5       The trial court also excluded as testimonial Brynn's statements in her petition for dissolution of marriage. The trial court excluded defendant's conviction of domestic battery involving another victim. At the time of Brynn's disappearance defendant was on probation resulting from his June 19, 2002, plea of guilty to two domestic batteries he committed against Brynn. The trial court excluded evidence of the convictions. The trial court also barred the testimony of John Havens, a friend of Brynn's to whom she had confided that defendant beat her and kept her tied up for three days. Havens said that the last time he saw Brynn she had two black eyes and she told him that if she ever went missing it meant that defendant killed her.

¶ 6       The trial court allowed live testimony of observations of prior domestic violence and spousal abuse, as well as statements made to nonpolice witnesses that fit within a hearsay exception. The court ruled that this evidence was relevant and probative to show defendant's "intent, motive, and lack of mistake." This evidence came from nine different witnesses who testified that they saw acts of domestic violence, observed injuries on Brynn, or provided shelter for Brynn when she fled from defendant. The more substantial evidence consisted of testimony of police officers, crime scene investigators, background witnesses, and forensic scientists, specifically, blood spatter and DNA experts.

¶ 7       During the State's opening statement it made no mention of prior acts of domestic violence. The State focused on the blood evidence as well as defendant's failure to participate in efforts to find his missing wife. Defense counsel referred to the relationship between defendant and Brynn as "rocky" and "anything but smooth" and acknowledged that there were "physical as well as verbal" arguments.

¶ 8       Edward Lamb testified that he owned the home in Capron, Illinois, where defendant and Brynn were living at the time of Brynn's disappearance. Defendant rented a room in Lamb's

---

[1]The State did not argue that these statements to the police and in petitions for orders of protection should be admissible under the doctrine of forfeiture by wrongdoing. See *Giles v. California*, 554 U.S. 353, 377 (2008).

house and moved in early in 2002, about six months before Brynn moved in. Everyone had access to the common areas of the house but bedrooms were private. Lamb testified that he gave defendant a California king-sized bed. The mattress had no stains or tears on it when Lamb gave it to defendant.

¶ 9 Lamb testified that he last saw Brynn the night of November 16, 2002, when he left her and defendant alone in the house, except for Lamb's two dogs. Lamb spent the night with an acquaintance, who verified Lamb's alibi. When Lamb returned the next day Brynn was gone. Defendant told Lamb that Brynn left, leaving behind her keys and ring on the kitchen table.

¶ 10 Lamb testified that defendant appeared agitated. He asked defendant if he had called anyone and defendant said no. Lamb told defendant that Brynn would come back like she had in the past, and defendant responded that "she had done left him for good this time." Both Brynn's Jeep and defendant's Audi were still parked at the residence. Lamb testified that in the past Brynn would leave for a day or two and then return.

¶ 11 A few days after Brynn's disappearance Lamb offered to wash defendant's bedsheets while he was doing his laundry but defendant said no. Lamb testified that on December 20, 2002, detectives showed him a bloodstain on the mattress he had given to defendant. Lamb later asked defendant about the stain and defendant said he did not know anything about it. He told Lamb that if there was a stain on it then Brynn must have flipped the mattress over. Lamb told the police that on December 23, 2002, he noticed that a blue tarp and a sheet were missing from his residence. In February 2003 defendant told Lamb that Brynn had an accident in the bed, referring to her menstrual period. Eventually, defendant moved out after getting into an argument with Lamb. Defendant left Brynn's belongings behind. He told Lamb that he did not care what he did with "the bitch's stuff."

¶ 12 Brynn's mother, Linda Olson, testified that Brynn was born on April 26, 1977. Brynn met defendant in January 2000 and married him on November 3, 2000. At the time of her disappearance Brynn lived with defendant in Capron, Illinois, and worked with Olson at U.S.A. Marketing in Loves Park, Illinois. Olson saw Brynn for the last time on November 16, 2002, a Saturday on which Brynn worked a half day. When Brynn did not show up for work on November 18 and 19, Olson thought that Brynn was probably resting from work that had been done on her teeth. On November 21, Olson called defendant and asked him where Brynn was. Defendant told Olson that he thought that Brynn had gone to stay with her. Olson then reported her daughter missing to the Winnebago County sheriff's office and then the Boone County sheriff's office. Olson testified that prior to November 16, 2002, she had hidden Brynn from defendant once, in late November 2001. Olson described the efforts to find Brynn, which included printed posters for distribution. When Olson went to defendant's home he allowed her into the kitchen area only and he declined to take any of the posters. Defendant also refused to let Olson take any of Brynn's belongings. Brynn was never seen or heard from again. She never collected her last paycheck. Defendant never volunteered to help find Brynn. On cross-examination Olson testified that Brynn's drug of choice was crack cocaine, which Olson and Brynn shared.

¶ 13 Arnold Mariani, a Boone County sheriff's deputy, testified that on November 20, 2002,

he went to defendant's home in Capron on a missing person's report. Defendant met with him in the kitchen area of the home. Defendant said that when he woke up Sunday morning his wife was missing. Defendant told the deputy that Brynn's keys and her wedding ring were on the kitchen table and would have her fingerprints on them. He also said that Brynn's car was still there. Defendant said that Brynn had a crack problem. He said that in the past "she has been at her family's house and they have hidden her." Defendant said that in the past he had been arrested for domestic battery. Mariani testified that he accepted defendant's story and did not file a missing person's report. The next day Mariani spoke to Olson and after that he did file a missing person's report. He also entered Brynn's name and identifiers into a national computer database.

¶ 14 Daniel Smith testified that he lived in Rockford on Darwood Street, in the same apartment complex where Brynn and defendant lived previously. On September 4, 2001, shortly before noon, Smith heard someone yelling for help outside his apartment. When he opened the door Brynn ran inside. She was scared, nervous, and dressed only in a T-shirt. Brynn told Smith that her husband was going to kill her. When Smith began to close the door, defendant put his hand between the door and the wall. Smith held the door to prevent defendant from getting inside the apartment. Defendant removed his hand from the door and returned to his own apartment. Smith and Brynn waited until they saw defendant leave his apartment before Smith would let Brynn call the police, who then came to Smith's apartment to interview him and Brynn. The next day, defendant came to Smith's apartment and apologized.

¶ 15 Ronald Cole, a retired Rockford police officer, testified that on September 4, 2001, at about 12:30 p.m., he went to Smith's apartment to take a domestic battery complaint from Brynn. Cole was not permitted to repeat Brynn's statements but he was allowed to describe Brynn's appearance. He said that Brynn was upset, crying, and frightened. He told Brynn that if redness or swelling developed she should come to the police department to be photographed. Cole made arrangements for Brynn to stay with a friend as a temporary safe house.

¶ 16 Rockford police officer Lieutenant Mark Welsh testified that he photographed Brynn on September 5, 2001. The photographs were admitted into evidence, depicting injuries on the backs of both shoulders, which consisted of slight bruising and some lacerations. Welsh testified that the injuries were from an incident that took place on September 4, 2001.

¶ 17 Lieutenant Jerry Ashens of the Boone County sheriff's office testified that on November 22, 2002, he conducted a "walk around" of defendant's house, looking for Brynn. Defendant explained that he and Brynn were renting a bedroom in the single-family house, which was owned by Lamb. Defendant pointed out Brynn's keys and her ring on the kitchen table. Defendant told Ashens that he and Brynn ate dinner at a restaurant the night of November 16, 2002, and then returned home, where they wrapped a present, watched a movie, drank beer, had sex, and went to bed around 1 a.m. Defendant said that when he woke up the next morning Brynn was gone. According to defendant Brynn took no personal belongings with her, not even a toothbrush or birth control pills. On December 13, 2002, Ashens returned to defendant's home and asked defendant to give him Brynn's birth control pills; defendant consented.

¶ 18      On December 19, 2002, Ashens, along with Detective Gay and Detective Burk, visited defendant's home to obtain personal hygiene items that belonged to Brynn. Defendant signed a written consent to search. The officers looked throughout the house. While Ashens and Burk were speaking to defendant in the bedroom he had shared with Brynn, Gay was looking around the area of the bed. Gay announced that the consent search was over and that it was time to leave to get a search warrant. Defendant refused to leave initially but after speaking to his grandfather he agreed to leave. The house was secured and a search warrant was issued for the house, Brynn's Jeep, and defendant's Audi. The Boone County sheriff's office, along with the Illinois State Police, executed the search warrant. On December 20, 2002, Ashens had contact with defendant at defendant's mother's home. Defendant told Ashens that he was shocked when he learned that the police had found blood in the house. Defendant then provided keys to his Audi. On January 13, 2003, Ashens asked defendant to sign a release for Brynn's dental records. Defendant refused.

¶ 19      Detective Perry Gay testified that during the consent search of defendant's bedroom on December 19, 2002, he noticed what appeared to be bloodstains in the form of "blood spatter on the west wall of the bedroom." He explained that "blood spatter is created after an object [is] struck, say, upon a person one or more times." Gay participated in the execution of the search warrant on the house and defendant's Audi.

¶ 20      Former State Police Sergeant Anthony Heindel and former crime scene investigator Jose Rangel provided extensive testimony regarding the search of defendant's bedroom and the Audi. Photographs of the Audi and the bloodstains on the walls of defendant's bedroom were identified and received in evidence. Heindel explained that, if someone is being struck repeatedly and blood starts flowing, blood will project outward and the instrument used will also cast off blood. Heindel said that he observed bloodstains on the walls and ceiling in the northwest corner of the bedroom. He testified that the points of convergence were on the bed. Upon seeing that there did not appear to be any stains on defendant's mattress, they turned the mattress over and saw a large bloodstain that measured 18 by 22 inches, which was soaked into the mattress. The mattress also had bloodstains in the form of dog tracks, which were created by a dog stepping in fresh blood and then onto the mattress. The mattress cover and padding were cut out and preserved for testing. Stains from the wall were swabbed for later analysis, along with items taken from the Audi. Brynn's driver's license was lying on the dresser in defendant's bedroom.

¶ 21      Retired Rockford police officer Brandon McGaw testified that on January 1, 2002, he went to Springfield and Auburn Streets in Rockford in response to a domestic dispute. McGaw met with Brynn. She had some bruising and knots on her head, which McGaw felt with his hands. The left side of Brynn's face, around her left ear, was bruised. A photograph of this injury was received in evidence.

¶ 22      Brett Workman, a former Boone County sheriff's deputy, testified that on September 8, 2002, he responded to defendant's home in Capron to take a missing person's report. Defendant told Workman he wanted to report his wife missing. He said she was a "crack head" and had been missing for a day. After taking the report, Workman was notified 20 minutes later that Brynn was home. Workman returned to the home and confirmed that she was there.

¶ 23    Tracie Mullen, a family friend of Brynn's, testified that when she saw Brynn on January 3, 2002, she looked "beat up." Mullen testified that Brynn lived with her from January 2002 until about five days before her divorce was to be finalized. Brynn filed for divorce in March 2002. During the last week of April 2002 Brynn told Mullen that she was moving back to Capron to live with defendant. While Brynn was living with Mullen, defendant called Mullen and told her that if Brynn did not come home now he would call the police and report the car she was driving as stolen.

¶ 24    Jennifer Hullinger, Brynn's cousin, testified that in 2001 she lived about one block away from Brynn and defendant. On one occasion, Brynn came to Hullinger's home on foot. She was scared, crying, and screaming. Brynn said that she was in a fight with defendant, that he was going to hit her and so she ran. Brynn stayed with Hullinger for the day until defendant left for work. A week after Brynn's disappearance, Hullinger and Paula Kirchner went to defendant's house and asked him if he wanted some missing-persons fliers about Brynn. Defendant said no, he had his own. Hullinger also asked defendant if she and Kirchner could gather some of Brynn's personal belongings and defendant said no.

¶ 25    Judith Wilson was defendant's neighbor in Capron. She testified that during the summer of 2002 she saw defendant and Brynn arguing on at least four occasions. Once, while defendant and Brynn were in the backyard, Wilson saw defendant push Brynn. Wilson was mowing her lawn at the time and could hear defendant yelling at Brynn over the lawn mower noise. On another occasion Wilson saw defendant holding onto the door handle of Brynn's Jeep as she was backing down the driveway. Defendant and Brynn were hollering at each other. Defendant finally let go of the handle and Brynn left. On a few occasions Wilson saw Brynn walk by her home crying and defendant would walk past soon thereafter. Wilson testified that during the second or third week of November 2002, in the early morning hours, she heard dogs barking and then the sound of glass breaking coming from Lamb's house.

¶ 26    Tanya Wilson, Judith's daughter, testified that she saw several verbal arguments between defendant and Brynn in 2002. When defendant and Brynn argued, the dogs in Lamb's house would bark. Tanya also testified to being awakened at about 3 a.m. sometime after Halloween and before Thanksgiving 2002 by the sounds of barking dogs, loud voices, and a door slamming coming from Lamb's house. A week later, Wilson found out that Brynn was missing.

¶ 27    Kirchner, Brynn's neighbor at the Darwood Street apartments and her cousin, testified that defendant and Brynn argued frequently. One night Kirchner was awakened by Brynn calling her name and asking her to open the door and help her. Defendant caught up to Brynn and grabbed her around the waist. Brynn grabbed the railing of Kirchner's porch, and defendant told her to let go and then dragged her back to their apartment. On another occasion Kirchner saw Brynn at her bedroom window. Brynn ripped the screen out and tried to get out but defendant grabbed her and dragged her away from the window. On another occasion Brynn came running into Kirchner's apartment saying not to let defendant in and that he had just hit her with a baseball bat. Brynn had bruises on the right side of her head. She was scared and trembling. Kirchner identified photographs of the injuries, which were taken the next day, January 4, 2001. Brynn obtained an order of protection that day against defendant. Brynn moved to a friend's house. Kirchner later learned that Brynn moved to

Capron to live with defendant despite getting an order of protection against him. Kirchner also described her efforts to help hide Brynn from defendant.

¶ 28 Sheila Belt, a neighbor, testified that on Valentine's Day 2001 she witnessed defendant and Brynn fighting. Brynn was on the ground and defendant was "pulling her hair like he was trying to pick her up off the ground by her hair." Belt also saw defendant kick Brynn in the thigh and in the side of her ribs. Brynn "was trying to push him off of her so she could get out of the snow and he continually kept knocking her back down." The two were yelling and screaming at each other. This went on for about 10 minutes. Brynn was finally able to get up and walk, with defendant a few steps behind her. In early March 2001 Belt visited Brynn at Mullen's home. Brynn was lying on a couch. She had a black eye and had trouble breathing. She also had bruises on her arm as well as a "goose egg bump" on the side of her head.

¶ 29 On November 9, 2007, Detective Shane Woody of the Belvidere police department obtained a DNA sample from defendant with a buccal swab. Defendant told Woody that he did not like surprises and could not wait for two more years. Defendant explained that "after seven years she can be declared legally dead" and he could get on with his life without dealing with people like the police anymore.

¶ 30 Cynthia Cole, a forensic DNA analyst at Strand Analytical Laboratory in Indianapolis, Indiana, testified that in November 2007 she received items recovered from the 2002 search of defendant's home and vehicle along with the buccal swab taken from defendant. Cole generated a DNA profile for Brynn from Brynn's toothbrush. A towel taken from the trunk of the Audi had bloodstains that matched Brynn's DNA profile. Blood on the mattress and pillow matched Brynn. Swabs taken from the stains on the wall also matched Brynn.

¶ 31 Blake Aper, a forensic DNA analyst for the Illinois State Police Forensic Science Laboratory, testified that the foam from the mattress padding contained bloodstains that matched Brynn's DNA profile.

¶ 32 Jeffrey Gurvis, an independent bloodstain-pattern analyst, testified that the bloodstains on the walls in the bedroom were the result of at least two impacts onto a blood source itself.

¶ 33 Carol Lieber from Rockford Dental Care testified that Brynn had an appointment for November 18, 2002. She did not show up and did not cancel or reschedule.

¶ 34 Defendant's motion for a directed verdict was denied. Defendant called Joseph Robbins of the Boone County sheriff's office. Robbins testified that on January 8, 2003, he placed a phone call to defendant to tell him the police had found a body. The police then conducted surveillance on defendant's house to see how he would respond. After four or five hours defendant left his home, drove to an address in Rockford, and returned home.

¶ 35 Defendant called his sister, Kari Ann Moye, who testified that she became aware of the domestic battery charges that were filed against defendant when he and Brynn were living in the Darwood Street apartment. She said that she attended the court appearance by defendant on those charges. She said that defendant and Brynn were "making out" and "cuddling" while seated on a bench near an elevator.

¶ 36 Defendant's mother, Debra Fletcher, testified that she gave defendant and Brynn her and her husband's wedding rings. She testified that Brynn once pawned the rings but she could not recall when or where. Fletcher testified that she was aware of one domestic battery charge

filed against defendant while he was married to Brynn. She testified that she posted bail for defendant. She also attended his court appearances, which Brynn also attended. She described the couple as looking "very happy" and "playing kissy-pooh." Fletcher testified that defendant called her the morning of Brynn's disappearance. Brynn had gone missing in the past, on four occasions that Fletcher was aware of. Later in the day Fletcher saw defendant at her grandson's birthday party. Defendant appeared fine and had no cuts or injuries.

¶ 37　　The State presented no rebuttal. The State's closing argument primarily focused on the forensic evidence and defendant's explanations for Brynn's disappearance. The State argued that the only reasonable explanation for the bloodstains on the walls and the large stain on the mattress was injuries inflicted on Brynn the night of November 16, 2002. Defense counsel argued that the absence of even a drop of Brynn's blood on the floor or stairs was not consistent with the State's theory and that there were other reasons for Brynn's disappearance. Counsel argued that "[t]here is no proof of any death except what [the assistant State's Attorney] would like to call circumstantial evidence." The jury returned a verdict of guilty on the charge of first-degree murder and the trial court sentenced defendant to 50 years in the Illinois Department of Corrections.

¶ 38　　Defendant filed a motion to reconsider in which he argued that "study after study is pointing out that severity of the sentence has no deterrence [*sic*] effect" on domestic violence. The court, in denying the motion, explained that this case "goes well beyond statistics." It said that deterrence was important, but not the sole factor, and again noted defendant's rehabilitative potential. Finally, the court noted that deterrence is about deterring others and the individual being sentenced.

¶ 39　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 40　　On appeal, defendant contends that the trial court abused its discretion when it denied, in part, his motion *in limine* to exclude other-crimes evidence. He argues that the alleged hearsay statements by Brynn regarding prior acts of abuse "have minimal probative value" and "fail to demonstrate either a motive or intent for murder." Defendant argues that the testimony of those hearsay witnesses was "wholly unrelated to the present case" and that "such extensive testimony and *argument* about the prior incidents was of dubious probative value and unduly prejudicial and should have been excluded." (Emphasis added.) As support for this contention defendant cites to *People v. Walston*, 386 Ill. App. 3d 598, 621-22 (2008). Defendant also argues that the trial court abused its discretion in imposing a 50-year prison sentence where defendant's prior criminal history consisted of those domestic battery convictions, a conviction of resisting a police officer, and a deceptive practices conviction, all of which resulted in sentences of probation or conditional discharge that he successfully completed.

¶ 41　　The State argues that the trial court properly admitted the evidence of prior abuse as the evidence was relevant to demonstrate defendant's intent, motive, and lack of mistake. The State notes that, with respect to the hearsay statements, the trial court ruled that they qualified as excited utterances. The State also argues that the trial court did not abuse its discretion in

sentencing defendant to 50 years, citing defendant's pattern of violence as well as his lack of remorse.

¶ 42                                    A. Other-Crimes Evidence

¶ 43     The State relied on the common law to support its argument that evidence of defendant's prior acts of domestic violence was admissible to show defendant's intent, motive, and lack of mistake. Under the common law, it is well settled that evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit crime. *People v. Chapman*, 2012 IL 111896, ¶ 19. Those purposes include, but are not limited to, motive, intent, identity, lack of mistake, and *modus operandi. People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). Under the common law, where evidence of other crimes "is offered for a permissible purpose and not solely for propensity, such evidence will not be admitted if its prejudicial impact substantially outweighs its probative value." *Chapman*, 2012 IL 111896, ¶ 19 (citing *People v. Moss*, 205 Ill. 2d 139, 156 (2001)). The admissibility of other-crimes evidence is committed to the sound discretion of the trial court, and its decision will not be disturbed absent a clear abuse of discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Sutherland*, 223 Ill. 2d 187, 272-73 (2006) (citing *People v. Hall*, 195 Ill. 2d 1, 20 (2000)). On appeal, the State argues that, aside from the traditional grounds for allowing other-crimes evidence, the trial court's ruling is supported by statute, specifically, section 115-7.4 of the Code of Criminal Procedure of 1963 (Code), and Illinois Rule of Evidence 404(b). 725 ILCS 5/115-7.4 (West 2008)[2] (evidence in domestic violence cases); Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (other crimes, wrongs, or acts).

¶ 44     Defendant's argument that the admission of other-crimes evidence became the focus of the trial, instead of whether Brynn was in fact dead and whether defendant was responsible for her death, is not supported by the record. We first note that the other-crimes evidence accounted for a mere 250 pages of the trial record, whereas the testimony of witnesses relating to the events that occurred on the day of the murder and to the crime scene accounted for 1,200 pages of the trial record. Many of the other-crimes witnesses also provided background information concerning their relationship with Brynn and the efforts to find Brynn.

¶ 45     Defendant cites *People v. McKibbins*, 96 Ill. 2d 176, 186-87 (1983), for the proposition that other-crimes evidence should not lead to a "mini-trial" on the other offenses. Defendant provides no example of such a mini-trial in this case. Indeed, the trial court carefully limited the testimony and excluded Brynn's testimonial statements to the police, her statements in the petitions for orders of protection, and her divorce filings. As the State points out, the other-crimes evidence was targeted and brief.

_____

[2]Although section 115-7.4 of the Code did not exist at the time of the offense, we can consider the State's argument because that statutory section existed at the time of trial. See 725 ILCS 5/115-7.4 (West 2008).

¶ 46    Defendant argues without citation to authority that the "circuit court erred in admitting allegations of prior discord between Brynn and the defendant not personally observed by the witness." Defendant also argues that the incidents of prior abuse introduced through hearsay statements had minimal probative value because they were "unsubstantiated." Defendant cites no authority for this proposition. The weight to be accorded to this testimony was for the jury to decide. We also disagree with defendant's characterization that the statements were unsubstantiated. Each of the statements was corroborated by Brynn's physical appearance and demeanor. Photographs were also introduced to corroborate two of the incidents. Defendant was seen chasing after Brynn on two occasions. He was also seen trying to prevent Brynn from driving away. The evidence as to each incident was "beyond a mere suspicion." *People v. Thingvold*, 145 Ill. 2d 441, 456 (1991).

¶ 47    Defendant's argument that the testimony concerning prior acts of domestic violence was "wholly unrelated" to the present case is belied by the record. It was defendant who first tied his prior arrest for domestic battery to Brynn's disappearance. He told Mariani that in the past Brynn had a crack cocaine problem, that he had been arrested in the past for domestic battery, and that Brynn had been hidden from him by her family. It has long been recognized that evidence of "a defendant's prior acts of violence against the victim may also provide evidence of motive, in this case, a hostility showing him likely to do further violence." *People v. Illgen*, 145 Ill. 2d 353, 367 (1991). Our supreme court recently held that under section 115-7.4 of the Code "evidence of a defendant's commission of other acts of domestic violence may be admitted in a prosecution for one of the offenses enumerated in the statute, so long as the evidence is relevant and its probative value is not substantially outweighed by the risk of undue prejudice." *Dabbs*, 239 Ill. 2d at 291; see 725 ILCS 5/115-7.4 (West 2008). Such evidence may be considered for its bearing on any matter to which it is relevant, including propensity. *Dabbs*, 239 Ill. 2d at 291-92. Defendant argues that the hearsay nature of much of the other-crimes evidence caused it to have "minimal probative value" and was therefore "unduly prejudicial." In an apparent attempt to highlight the weakness of the other-crimes evidence, defendant maintains that "[n]one of the alleged conduct by the defendant to which the witnesses testified resulted in either charges or a conviction against the defendant." In order for other-crimes evidence to be admissible, the accused need not have been convicted of the earlier offense. See *People v. Roberson*, 401 Ill. App. 3d 758, 771 (2010). In order to be admissible, proof of the other acts need not be beyond a reasonable doubt, but must be beyond a mere suspicion. *Thingvold*, 145 Ill. 2d at 456. While it certainly may be preferable to have live eyewitnesses testify to the prior acts, there is no such requirement in the law. Defendant cites to *People v. Heard*, 187 Ill. 2d 36 (1999), where the supreme court upheld the admission of other-crimes evidence from witnesses who "personally observed" the prior acts. In *Heard*, the defendant was convicted of murdering his ex-girlfriend. The victim's 10-year-old son testified to several prior episodes of violence by the defendant against the victim. The supreme court held that the other-crimes evidence was admissible to show the defendant's "motive and intent." *Id.* at 59. The court did not limit the admissibility of other-crimes evidence to those acts that are personally observed by the witnesses who testify.

¶ 48    Defendant cites *McKibbins* and *Walston* for the proposition that the caution against

conducting "mini-trials" on collateral offenses "remains even where there are statutory provisions allowing the admission of propensity evidence in certain cases." We do not disagree. But in this case the focus of the trial was on Brynn's disappearance, the efforts to find her, and the substantial blood and DNA evidence.

¶ 49    Defendant cites *People v. Brown*, 319 Ill. App. 3d 89, 96-97 (2001), for the proposition that "[c]umulative evidence of other conduct can overpersuade the jury to convict the defendant as a bad person, rather than because he was guilty of the crime charged." In *Brown*, 6 of the State's 12 witnesses testified about a single prior event, much of which testimony was repetitive. No such error occurred in this case. For each prior act, the evidence was targeted with only one or two witnesses. Many of those witnesses also testified to their relationship with Brynn and the efforts to find her. The prosecution did not even mention the prior offenses in its opening statement and made only a few references to the other offenses in its closing argument. Defendant cites to only one page in the record where the State argued other-crimes evidence. We have examined the entire argument and find nothing improper. The prosecutor made reference to the testimony of Smith, who witnessed Brynn's flight from defendant and stated that Brynn told him "he's trying to kill me." The court overruled the defense objection. The prosecutor continued by recounting some of Kirchner's testimony. The statements by the prosecutor merely referred to and summarized the testimony that we hold was admissible; therefore, no error occurred. *McKibbins*, 96 Ill. 2d at 187.

¶ 50    Defendant makes no argument that the trial court misapplied the excited-utterance exception to the hearsay rule. Ill. R. Evid. 803(2) (eff. Jan. 1, 2011). Likewise, he does not challenge the admissibility of the other-crimes evidence on grounds of remoteness or lack of factual similarity. See 725 ILCS 5/115-7.4(b)(1), (2) (West 2008). Instead, defendant argues that the volume of the evidence of other crimes rendered it prejudicial because it focused the jury's attention "as much or more on those prior incidents as on the present charge" and cites to *Walston*, 386 Ill. App. 3d at 621-22. *Walston* involved other-crimes evidence admitted for propensity pursuant to section 115-7.3 of the Code against a defendant charged with aggravated criminal sexual assaults against two victims. In upholding the defendant's convictions in *Walston*, we said that "the actual limits on the trial court's decisions on the quantity of propensity evidence to be admitted under section 115-7.3 are relatively modest, especially when combined with the highly deferential abuse of discretion standard." *Id.* at 621. This is also true of other-crimes evidence introduced in cases involving domestic violence. For example, in *People v. Burgess*, 176 Ill. 2d 289 (1997), the defendant was convicted of first-degree murder and aggravated battery of a 3½-year-old child. Multiple witnesses testified that on prior occasions they had heard or seen the defendant strike the child, or they saw marks on the child's skin. One witness who lived next door testified that the defendant would spank the child four or five times a day. The supreme court rejected an argument that the evidence of prior acts of abuse was not sufficiently probative because none of the witnesses actually saw the defendant commit any act of abuse toward the victim. *Id.* at 307. Instead, the supreme court held that the trial court did not abuse its discretion in allowing the evidence. *Id.* at 308. The defense's theory in that case was that the child suffered the injuries in a series of accidents the day of his death. The supreme court held that the prior acts of abuse were relevant to show the presence of intent and the absence of accident. *Id.*

¶ 51 In *Illgen*, the defendant was convicted of the murder of his wife. The supreme court upheld the trial court's ruling that allowed evidence of physical abuse by the defendant against the victim throughout the marriage, including his striking the victim on multiple occasions and the observation of black and blue marks on the victim's face. The prior acts took place between 1972 and 1989. *Illgen*, 145 Ill. 2d at 362. The defense in *Illgen* was that the gunshot wound inflicted by the defendant on the victim was the result of an accident. The court said that "the evidence that the defendant physically assaulted his wife throughout their marriage was relevant to show their antagonistic relationship and, thus, tended to establish the defendant's motive to kill her." *Id.* at 367. The same is true in this case. At trial, the defense argued that the State had not even proven a murder had occurred and that there may be other explanations for the blood. The State was entitled to establish intent, motive, and the lack of an accident or a mistake, such as from Brynn's menstrual period as defendant told Lamb, and thus to establish that the blood was the result of a final act of domestic violence inflicted upon Brynn by defendant.

¶ 52 Having determined that the evidence of other crimes was clearly admissible for the purposes identified by the trial court, we need not consider the State's alternative argument that the evidence was also admissible under section 115-7.4 of the Code to show propensity. 725 ILCS 5/115-7.4 (West 2008).

¶ 53                                  B. The 50-Year Sentence

¶ 54 Next, defendant argues that the trial court abused its discretion in sentencing him to 50 years in the Illinois Department of Corrections.

¶ 55 While Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) gives reviewing courts the power to reduce a sentence, that power should be used carefully and sparingly. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Trial courts have broad discretion in sentencing and a sentence that is within the statutory limits may not be disturbed on review absent an abuse of discretion, *i.e.*, where the sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). Defendant's sentence falls within the 20- to 60-year sentencing range. Thus, we must give the trial court's decision great deference. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995).

¶ 56 All sentences should consider the seriousness of the crime and the objective of returning the offender to useful citizenship. Ill. Const. 1970, art. I, § 11. Careful consideration must be given to all mitigating and aggravating factors including the defendant's age, demeanor, habits, and mentality, deterrence, and rehabilitation. *People v. Raymond*, 404 Ill. App. 3d 1028, 1049-50 (2010). A sentencing court may consider evidence of criminal conduct for which no prosecution or conviction ensued, provided that the evidence is both relevant and reliable. *People v. Richardson*, 123 Ill. 2d 322, 361 (1988). Even though a reviewing court may have weighed these factors differently than the trial court, an alteration in the sentence may not be warranted. *Raymond*, 404 Ill. App. 3d at 1047-48.

¶ 57 Defendant does not argue that the trial court failed to consider any mitigating factors. He argues instead that, despite the seriousness of the crime, the sentence is excessive given his

"minimal" criminal history. Defendant states that all of his prior criminal convictions resulted in sentences of either probation or conditional discharge, noting that he successfully completed those sentences.

¶ 58　　At the time of sentencing, defendant was 39 years old. The record reveals that in 1996 defendant was convicted of resisting a peace officer and domestic battery. In September 2001 he was convicted of deceptive practices. In June 2002, defendant was convicted of two domestic batteries in which Brynn was the victim. We do not agree with defendant's characterization of this record as "minimal." Defendant somehow escaped being prosecuted for felonies for the domestic batteries to Brynn. In Illinois, a second conviction of domestic battery is a Class 4 felony. 720 ILCS 5/12-3.2(b) (West 2002). Defendant was given a second and a third chance by the court that sentenced him to probation, less than half of which was completed when he murdered Brynn. According to the Illinois Domestic Violence Act of 1986, domestic violence is a serious crime that often escalates, culminating in intrafamily homicide. 750 ILCS 60/102(1) (West 2002). Further, the trial court here could properly consider the evidence of defendant's uncharged conduct because it was relevant and reliable. The court carefully considered all relevant factors, including the circumstances of the offense.

¶ 59　　During his sentencing argument, counsel for defendant argued that defendant was "an average Joe, minds his own business–goes to work–plays video games–raises birds–plays with his nephews." Defense counsel also argued that Brynn allowed the two emergency orders of protection that she obtained against defendant to expire. With respect to the facts of this case, counsel argued that "we don't really know what happened."

¶ 60　　The trial court disagreed with counsel's statement that "we don't really know." The court considered the circumstances of the offense, including defendant's acts of concealment, which were so successful that Brynn's body "hasn't been found." The court considered defendant's education and his history as an excellent worker. The court also gave weight to its ability to "deter others." In addition, the court noted that although defendant was not a "hardened criminal" he was a violent person. It gave consideration to defendant's potential for rehabilitation and the aim to restore defendant to useful citizenship, but found that the murder of Brynn was "a culmination of events." In announcing the sentence the court also commented that "deterrence is the most necessary element in this case."

¶ 61　　Defendant filed a motion to reconsider in which he argued that "study after study is pointing out that severity of the sentence has no deterrence [*sic*] effect" on domestic violence. The court, in denying the motion, explained that this case "goes well beyond statistics." It said that deterrence was important, but not the sole factor. The court again noted defendant's rehabilitative potential. However, although defendant had been given an opportunity to change, the violence continued, culminating in murder. Finally, the court noted that deterrence is about deterring others and the individual being sentenced.

¶ 62　　Having carefully reviewed the record and the arguments on appeal, we find nothing that convinces us that the sentence imposed resulted from an abuse of discretion.

¶ 63                          III. CONCLUSION

¶ 64     For the foregoing reasons we hold that the trial court did not abuse its discretion in admitting evidence of prior acts of domestic violence. Further, the trial court did not abuse its discretion in sentencing defendant to 50 years in the Illinois Department of Corrections. Defendant's conviction and sentence are affirmed.

¶ 65     The judgment of the circuit court of Boone County is affirmed.

¶ 66     Affirmed.