2020 IL App (1st) 182671-U

FIFTH DIVISION
DECEMBER 18, 2020

No. 1-18-2671

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 DV 30420 |
| | ) | |
| RICHARD MARSHALL, | ) | Honorable |
| | ) | Samuel J. Betar, III, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant did not receive ineffective assistance of counsel; the defendant forfeited and affirmatively waived his other arguments.

¶ 2    Following a bench trial in the circuit court of Cook County, the defendant-appellant, Richard Marshall, was convicted of domestic battery. He was sentenced to one year of conditional discharge, ordered to submit to a mandatory sex offender evaluation, and had a two-year order of protection entered against him. The defendant now appeals. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4     On June 13, 2018, the State charged the defendant with domestic battery based on the allegation that, on May 18, 2018, he touched the buttocks and breasts of C.T. who is his stepdaughter. A bench trial commenced, and the following evidence was presented.

¶ 5     C.T., who was 14 years old at the time of trial, testified. The defendant is the stepfather of C.T. and her four brothers, and the father of her two half-sisters. C.T. stated that her mother began dating the defendant in 2015. In 2016, C.T.'s mother married the defendant, and they moved their family from Ohio to Illinois. C.T. described the marriage between her mother and the defendant as "toxic" and explained that the defendant would leave their house for days or weeks at a time.

¶ 6     C.T. testified that, in November 2016, she went to the park with the defendant, her mother, and three of her siblings. The defendant began pushing C.T. on a swing. As the defendant pushed her, he touched her buttocks by placing his hands on the outside of her jeans. C.T. jumped off the swing and told her mother, but they did not call the police. (The swing incident.)

¶ 7     C.T. further testified that, in January 2017, she was inside her bedroom with her younger sister. As C.T. was undressing, the defendant opened her bedroom door. C.T. pushed the door closed and told the defendant she was changing, but the defendant forced the door open and entered the bedroom. C.T. felt scared and put a shirt on quickly. The defendant then "took [her younger] sister and *** left" the bedroom. C.T. told her mother what happened, and they reported it to the police that same day. (The changing incident.)

¶ 8     On May 8, 2018, it was C.T.'s birthday. That morning, she "woke up to [the defendant] hovering over [her] bed." The defendant was so close to her face that she could "feel or smell his breath." C.T. felt scared and told the defendant so. The defendant told her that he had a birthday

present for her and to follow him to his bedroom for it. C.T. did not move from her bed, however, because she felt afraid. Eventually, the defendant left and returned with the birthday present, which was a gift card. After the defendant gave C.T. the present, he asked her for a hug. She stepped out of the bed and gave him a hug as he wished her a happy birthday. The defendant then left, but he came back into the room and he told C.T. "that he wants to get to know [her] more and that when [she] hug[s] him, to not be awkward about it because he's not trying to have sex with [her]." C.T. told her mother what happened, who said that she would talk to the defendant about it. (The birthday incident.)

¶ 9     C.T. then testified about an incident that occurred on May 18, 2018, for which the defendant was charged. She stated that, at approximately 10 a.m., she was lying in her bed and watching videos on her phone while wearing headphones. She was staying home from school that day because she was feeling ill. Her mother was home but was on the front porch with her two younger sisters. The defendant entered C.T.'s bedroom without knocking. She kept her headphones on and tried to ignore him because she felt scared. The defendant walked toward her, removed the blanket off her, and told her to stand up. C.T. complied and stood up; she continued to feel scared. She was wearing long pajama pants, a t-shirt, and a bra. The defendant then picked C.T. up into a hug. She yelled for him to put her down, which he did. During C.T.'s testimony about the incident, the following colloquy ensued:

"[THE STATE]: After he put you down from a hug, [C.T.], what, if anything, did the defendant do?

[C.T.]: He told me to be quiet because he didn't want my mom to hear. And his hands were at my butt, and he cupped them.

[THE STATE]: When you say that he cupped your butt, is he using both hands?

[C.T.]: Both hands.

[THE STATE]: Is he touching one part of your butt or both [parts of] your butt?

[C.T.]: Both.

[THE STATE]: As he's grabbing your butt at this point, what, if anything, is he saying?

[C.T.]: He told me that he's allowed to touch me.

[THE STATE]: He said he's allowed to touch you?

[C.T.]: Yes.

[THE STATE]: Are you saying anything at this point?

[C.T.]: No.

[THE STATE]: After he grabbed your butt, did he touch any other part of your body?

[C.T.]: His hands traveled from my butt up to the side of my breasts.

[THE STATE]: And when you say they traveled up to the side of your breasts, was he going up the front part of your shirt or the back part of your shirt?

[C.T.]: The back.

[THE STATE]: Is he inside or is he outside of your shirt at this point?

[C.T.]: Outside.

[THE STATE]: Does he, in fact, touch the side of your breasts?

[C.T.]: Yes.

[THE STATE]: Does he touch both breasts?

[C.T.]: Yes.

[THE STATE]: And he uses both hands?

[C.T.]: Yes.

[THE STATE]: Is he saying anything at this point?

[C.T.]: He told me that my mom is leaving that weekend and that he needs me here. He told me to stay and not go anywhere because he needs me.

[THE STATE]: Did the defendant leave the room after that?

[C.T.]: Yes."

¶ 10    C.T. testified that after the defendant left her bedroom, she laid back down in her bed. The defendant then returned, sat on her bed, and told her that she does not need to tell her mother about everything that he does. The defendant left. C.T. went into the bathroom, locked the door, and cried. Approximately 20 minutes later, she looked out the bathroom window to see if the defendant's car was gone, which it was. C.T. went downstairs and told her mother what happened. A short time later, C.T. and her mother went to the police station and filed a report.

¶ 11    On cross-examination, defense counsel asked C.T. about when she was filing her report with a police officer:

"[DEFENSE COUNSEL]: Did you indicate to [the police officer] that the only two times that you felt uncomfortable was when [the defendant] was pushing you on the swings and when [the defendant] allegedly walked into the room?

[C.T.]: Yes.

[DEFENSE COUNSEL]: So you didn't indicate to the officer anything regarding, nor have you indicated to any officer anything regarding an incident on your birthday?

[C.T.]: I don't recall."

¶ 12 The State then rested and the trial court ordered a short recess for lunch. Following the recess, the trial court stated to the parties:

"For the sake of disclosure, during the lunch break while I was thinking about this case, I recalled that I've handled -- previously heard on May 18, 2018 the case of Cheryl Marshall versus Richard Marshall, 10 18 OP 30372, which was an *ex parte* petition for an emergency order of protection, which is a civil case."

Defense counsel responded, "Sure." The trial court then continued:

"So I entered the [order of protection] in the appropriate manner. On June 8th of this year, Judge Greenblatt continued that emergency order of protection to June 22nd. And then on June 22nd, apparently by agreement of the parties, I terminated the emergency order of protection."

Following the trial court's disclosure statement, defense counsel filed a motion for a directed verdict, arguing that the State had failed to prove him guilty beyond a reasonable doubt. The trial court denied the motion and the defendant presented his case.

¶ 13 The defendant testified that he is married to C.T.'s mother, Cheryl, but that their marriage was in the process of divorce. The defendant testified that he has a "good" relationship with C.T., but he does not interact with her "frequently." He testified that he does not have much of an opportunity to interact with the older children on weekday mornings because he wakes up around

9 a.m., and they are already at school by then. He typically leaves for work between 10 a.m. and 12 p.m.

¶ 14    The defendant testified that on May 17, 2018, the day before the alleged incident with C.T., he was awakened by his two-year-old daughter crying. He went into the bedroom that the two-year-old girl shared with C.T. and their other sister so that he could change and feed the two-year-old. When he entered the room, however, he saw C.T. "on her knees with her hand on her crotch, and [the other sister] was about one foot from her." He thought it was "bizarre" but did not say anything at the time. He later told the Department of Children and Family Services about it, though.

¶ 15    Later in the day on May 17, 2018, the defendant went to work. He returned between 4:30 and 5:00 a.m. on May 18, 2018. He went to bed and woke up at approximately 10 or 10:30 a.m. on May 18, 2018. After he woke up, he did his usual hygiene routine, said goodbye to his wife, and left for work around 11:25 a.m. He did not see any of the children that morning. He testified that, prior to the trial, he had not seen C.T. since May 17, 2018. He testified that he never hugged C.T.

¶ 16    On cross-examination, the defendant denied touching C.T.'s buttocks when he pushed her on the swing. He also denied ever forcing C.T.'s bedroom door open as she was undressing. The defendant testified that he gave C.T. a gift card for her birthday, but he did not hover over her bed or ask her to follow him to his bedroom. He further denied ever touching C.T.'s buttocks or breasts in any way. The defendant never had a conversation with his wife about touching the children inappropriately and he never left his home for weeks at a time.

¶ 17    At the conclusion of trial, the trial court stated:

"The Court's heard the sworn testimony of the complaining witness and of

the defendant and has considered argument of able counsel for both sides. The Court's had the opportunity to observe the demeanor of each witness while testifying and thus made conclusions regarding the credibility of the testimony of each of the two witnesses. The Court finds that the testimony of [C.T.] was credible. The Court finds that the testimony of the defendant, Richard Marshall, was not credible."

The trial court then found the defendant guilty of domestic battery. The trial court subsequently sentenced the defendant to one year of conditional discharge, ordered him to submit to a mandatory sex offender evaluation, and entered a two-year order of protection against him.

¶ 18   The defendant then filed, through new counsel, a "motion to reconsider the verdict/motion for a new trial" (posttrial motion).[1]  The written posttrial motion argued, *inter alia*, that the State failed to prove the defendant guilty beyond a reasonable doubt, that the trial court made several errors in its rulings, and that the defendant received ineffective assistance of counsel. Notably, the posttrial motion did not make any argument concerning the trial court's comment about the *ex parte* hearing in the separate petition for an emergency order of protection that C.T.'s mother had brought against the defendant. However, during arguments on the posttrial motion, defense counsel raised the issue verbally. The following exchange ensued:

"[DEFENSE COUNSEL]: I mostly just stand on the motion. The only other issue that I don't think was in the motion, I know something came up at trial that I think your Honor had been involved in an *ex parte* hearing in this matter. And I'm not suggesting anything improper happened. I believe when the complaining

---

[1]The defendant also filed a motion to reconsider sentence which is not relevant to this appeal.

witness came in to get the emergency order of protection, you may have presided over that. It was in the trial transcript."

THE COURT: Well, yes. It's an emergency order of protection without notice.

[DEFENSE COUNSEL]: Yeah, but --

THE COURT: So, of course, it's *ex parte*.

[DEFENSE COUNSEL]: I understand, your Honor.

THE COURT: Yeah.

[DEFENSE COUNSEL]: It just -- it wasn't in our motion for a new trial, and just to preserve it for any appeal issues, I am just bringing it up.

THE COURT: All right. I understand. All right. Anything else, [c]ounsel?

[DEFENSE COUNSEL]: At the end of the day, I can just rely on the motion."

Following arguments, the trial court denied the defendant's posttrial motion. This appeal followed.

¶ 19                                        ANALYSIS

¶ 20     We note that we have jurisdiction to consider this matter, as the defendant filed a timely notice of appeal following the denial of his posttrial motion. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 21     The defendant presents the following two issues on appeal: (1) whether he received ineffective assistance of counsel when his defense counsel failed to object to evidence of the defendant's prior bad acts toward C.T.; and (2) whether the defendant's due process rights were violated by the trial court when it considered outside evidence from the *ex parte* hearing in the

separate emergency order of protection sought by C.T.'s mother.

¶ 22    The defendant first argues that he received ineffective assistance of counsel when his defense counsel failed to object to evidence of the defendant's prior bad acts toward C.T. Specifically, he claims that C.T. testified to three prior acts for which he was not charged: the swing incident, the changing incident, and the birthday incident. The defendant argues that this testimony was improper propensity evidence, and so his defense counsel was deficient for not objecting to it.

¶ 23    Claims of ineffective assistance of counsel are reviewed through a two-part test that was announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court. *People v. Burrows*, 148 Ill. 2d 196, 232 (1992). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) the defendant was prejudiced. *People v. Veach*, 2017 IL 120649, ¶ 30 (citing *People v. Domagala*, 2013 IL 113688, ¶ 36). Prejudice is a reasonable probability of a different result of the proceeding absent counsel's deficiency, and a reasonable probability is probability sufficient to undermine confidence in the outcome. *Id.* When a reviewing court addresses an ineffective assistance of counsel claim, it need not apply the two-part test in numerical order. *Burrows*, 148 Ill. 2d at 232. We review claims of ineffective assistance of counsel *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 24    The basis of the defendant's ineffective assistance claim is that his defense counsel failed to object to evidence of his prior bad acts as improper propensity evidence. See *People v. Null*, 2013 IL App (2d) 110189, ¶¶ 43, 47 (evidence of the defendant's prior bad acts, even offenses

where the defendant has not been convicted, is admissible if relevant for any purpose other than to show a defendant's propensity to commit crime). We need not address whether defense counsel's performance was objectively unreasonable in failing to object to that evidence or whether it was merely trial strategy, however, because the defendant cannot demonstrate prejudice. Even assuming *arguendo* that defense counsel had objected to C.T.'s testimony about the swing incident, the changing incident, and the birthday incident, and the trial court had excluded that evidence, C.T. nonetheless unequivocally testified that the defendant forcibly touched her buttocks and breasts on May 18, 2018. That testimony, *on its own*, was sufficient for the court to convict the defendant. *People v. Wells*, 2019 IL App (1st) 163247, ¶ 23 (the unequivocal testimony of a single witness is sufficient to convict). The trial court stated that it found C.T. to be credible and the defendant to be incredible. The exclusion of C.T.'s testimony about the other three incidents would not have changed that credibility determination. Simply put, the record shows that the outcome of the defendant's trial would not have been different if his defense counsel had successfully objected to the admission of the prior bad acts evidence. Thus, the defendant was not prejudiced. See *People v. Miramontes*, 2018 IL App (1st) 160410, ¶ 19 (a defendant is prejudiced *only* when there is a reasonable probability that there would have been a *different outcome* in the defendant's trial). We therefore find that the defendant did not receive ineffective assistance of counsel.

¶ 25     The defendant next argues that the trial court improperly considered evidence outside the record at trial, which violated his due process rights. He contends that the trial court inappropriately considered testimony from C.T.'s mother during the *ex parte* hearing on her emergency order of protection against the defendant, which was filed at an earlier time, separate from the instant case.

The defendant avers that C.T.'s mother's testimony in that earlier *ex parte* proceeding bolstered C.T.'s testimony at the trial, and "it cannot be certain that [the trial court] did not rely on testimony from the *ex parte* hearing that contradicted [the defendant's] trial testimony."

¶ 26    The defendant concedes that he did not raise this issue before the trial court at any time during the trial. He further concedes that he did not raise this issue in his written posttrial motion. The defendant nonetheless argues that he did not forfeit this issue because his defense counsel *verbally* raised it during the hearing on his posttrial motion. However, it is well settled that to preserve an issue for appellate review, a defendant must object to the alleged error when it occurs *and* raise the issue in a posttrial motion. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 76 (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Raising the issue only *verbally* during arguments on the posttrial motion, as the defendant did here, does not provide the trial court an ample opportunity to consider the issue nor does it provide the other party an ample opportunity to respond. In turn, failing to include the issue in a *written* posttrial motion forfeits the issue for appellate review. *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 75 (issues must be raised in a posttrial motion or else they are forfeited). The manner in which the issue was raised verbally during arguments on the posttrial motion, without having included it in the written motion, seems almost an afterthought. Thus, the defendant has forfeited appellate review of this issue.

¶ 27    The defendant argues, for the first time in his reply brief, that we can still review this issue under the plain error doctrine. See *People v. Moore*, 2020 IL App (1st) 182535, ¶ 19 (the plain error doctrine is a narrow and limited exception to the general forfeiture rule). Even though points not argued in an appellant's opening brief are generally forfeited (Ill. S. Ct. R. 341(h)(7)), we recognize that raising the plain error doctrine in a reply brief is sufficient to allow us to review for

plain error. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). However, we find that the defendant affirmatively waived this issue when his defense counsel responded to the trial court's disclosure regarding the *ex parte* hearing by saying "Sure," and without any further inquiry, discussion, or show of concern proceeded with the trial. See *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 29 (when defense counsel affirmatively acquiesces to actions taken by the trial court, any potential claim of error on appeal is waived, and a defendant's only available challenge is to claim he received ineffective assistance of counsel).

¶ 28    That acquiescence by defense counsel functioned as the defendant's affirmative waiver to challenge this issue, which, in turn, is not subject to the plain error doctrine. *People v. Stewart*, 2018 IL App (3d) 160205, ¶ 19 ("This is because a party who acquiesces in proceeding in a given manner cannot show he was prejudiced by the proceeding."); see also *People v. Bates*, 2018 IL App (4th) 160255, ¶ 74 (the plain error doctrine does not apply to affirmative acquiescence; thus, "when defense counsel affirmatively acquiesces to actions taken by the trial court, any potential claim of error on appeal is waived and defendant's only available challenge is to allege that he received ineffective assistance of counsel"). Notably, the defendant in this case did not argue that he received ineffective assistance of counsel on this issue. Accordingly, the defendant has affirmatively waived his right to argue that the trial court improperly considered evidence from the separate *ex parte* hearing, even under the plain error doctrine. *Stewart*, 2018 IL App (3d) 160205, ¶ 20 ("[f]orfeited errors may be subject to plain-error review, but waiver forecloses review of a claim predicated upon the waived right").

¶ 29                                    CONCLUSION

¶ 30    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 31    Affirmed.