NOTICE

Decision filed 06/10/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180338-U

NO. 5-18-0338

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Christian County. |
| | ) | |
| v. | ) | No. 16-CF-42 |
| | ) | |
| ROBERT STIVERS, | ) | Honorable |
| | ) | Bradley T. Paisley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court correctly denied the defendant's motion to suppress in part where the defendant did not unambiguously and unequivocally invoke his right to remain silent, and the defendant's inculpatory statements were voluntary. The trial court also properly admitted evidence of other acts of domestic violence committed by the defendant pursuant to 725 ILCS 5/115-7.4 (West 2016). Finally, although the trial court erred in allowing the State to present evidence at trial of certain Facebook messages, such error was harmless.

¶ 2    Following a jury trial, the defendant, Robert Stivers, was convicted of aggravated battery (720 ILCS 5/12-3.05(b)(1) (West 2016)) and first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)) in the death of his four-month-old son, C.L. On appeal, the defendant contends that his convictions should be reversed and his case remanded for a new trial because: (1) the trial court erred in denying the defendant's motion to suppress, (2) the trial court abused its discretion by

1

allowing the State to introduce testimony at trial regarding other acts of domestic violence committed by the defendant, and (3) the trial court erred in admitting Facebook messages between the defendant and Katlynn Riley from February 2 through February 4, 2016. For the reasons that follow, we affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4     On February 16, 2016, the State charged the defendant with aggravated battery (720 ILCS 5/12-3.05(b)(1) (West 2016)). The information alleged that the defendant shook and squeezed C.L., a child under the age of 13, causing significant head and bodily injury including retinal detachments, extreme swelling of the brain, and a liver laceration. On November 16, 2016, the defendant was indicted by a grand jury for the offense of first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)). The indictment alleged that the defendant shook and squeezed C.L., knowing such acts created a strong probability of great bodily harm to C.L., thereby causing his death.

¶ 5                                 A. Pretrial Proceedings

¶ 6     On June 6, 2016, the defendant filed a "Motion to Suppress Confession" seeking to suppress inculpatory statements the defendant made to investigating officers. In his motion to suppress, the defendant alleged that the statements he made to the officers were not voluntary because the statements were made in response to promises of leniency made by the officers. The defendant also alleged that the officers continued to question the defendant after he invoked his right against self-incrimination under the fifth amendment to the United States Constitution (U.S. Const., amend. V).

¶ 7     After a hearing, the trial court initially denied the defendant's motion to suppress in its entirety. The trial court found that the defendant did not unequivocally invoke his right to remain

2

silent and that the officers did not make any promises of leniency to the defendant. After the defendant filed a motion to reconsider, however, the trial court entered an order granting the defendant's motion to suppress in part and denying it in part. The trial court found that the defendant made three potential invocations of his right to remain silent. The trial court determined that the defendant did not unequivocally invoke his right to remain silent at the first potential invocation but concluded that the defendant did invoke his right to remain silent at the second potential invocation. Thus, the trial court suppressed that portion of the interview following this second invocation. The trial court maintained that the defendant was not offered any promises of leniency in exchange for a confession. At trial, the State introduced the portion of the defendant's confession that was not suppressed.

¶ 8 On June 21, 2017, the defendant filed a motion *in limine* seeking to exclude evidence that the defendant was a violent person. On December 20, 2017, the State also filed a motion *in limine* pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2016)) seeking to introduce evidence of prior acts of domestic violence committed by the defendant. In total, the State sought to introduce nine alleged acts of domestic violence. At a hearing on the motions *in limine*, Breanna Livingston, the defendant's girlfriend and the mother of C.L., and Kendra Grammer, the girlfriend of the defendant's brother, testified about the acts of domestic violence. Following the hearing, the trial court entered an order allowing the State to introduce four of the nine alleged acts of domestic violence.

¶ 9 The first act of domestic violence involved the defendant punishing one of Livingston's sons, a four-year-old child, M.L. Grammer testified that after M.L. spilled food, the defendant placed M.L.'s hand on the edge of a table and repeatedly struck M.L.'s hand with a closed fist, causing him to cry. The trial court concluded that this incident constituted domestic violence

3

because it involved an act of physical abuse by a person acting in a parental role which, if true, "would shock the conscience of [the trial court]."

¶ 10 The second alleged incident involved the defendant forcing entry through the front door of Livingston's apartment. Livingston testified that she was arguing with the defendant and asked him to leave her apartment. After he exited the apartment, Livingston locked the door and informed the defendant that he was not allowed to return inside. The defendant left the area, but returned later, and forced his way through the locked door. At the time of this incident, Livingston was pregnant with C.L. The trial court found that this incident constituted harassment, and thus, domestic violence.

¶ 11 Regarding the third incident, Livingston testified that C.L. was crying and Livingston went to soothe C.L. The defendant told Livingston to let C.L. "cry it out." When Livingston picked up C.L., the defendant threw a baby bottle at Livingston's head. The bottle missed her head and hit the wall, leaving a hole. The trial court determined that this was an incident of domestic violence because the defendant's actions amounted to "knowing and reckless conduct which create[d] an immediate risk of physical harm."

¶ 12 Finally, Livingston testified about another altercation between her and the defendant. The defendant took Livingston's phone and refused to let her leave the apartment. When the defendant picked up C.L., Livingston ran from the apartment. The defendant then chased after Livingston and forced her back into the apartment. The defendant removed the battery from Livingston's phone and refused to allow her to leave. The trial court determined that this incident constituted physical abuse.

4

¶ 13　　In allowing the admission of these four acts of domestic violence, the trial court weighed the probative value of the acts against their prejudicial effect pursuant to section 115-7.4(b).[1] The trial court first found that these acts of domestic violence were close in time to the offenses charged because the acts occurred within six months of the charged conduct. The trial court also determined that the State sought to introduce the evidence to prove propensity, intent, and absence of mistake, which required only a "general familiarity" between the acts of domestic violence and the charged offenses. The court further found that the incident involving M.L. was factually similar to the charged offenses because the incident involved the defendant's reaction to "the behavior of young children that do not act the way [the defendant] thinks they should." Regarding the remaining incidents, the trial court found that the evidence was relevant to show that the charged conduct was not accidental and that the defendant "had the ability to form the requisite intent and had a propensity to commit acts of domestic violence when things did not go his way."

¶ 14　　After concluding that the proffered evidence was relevant to the offenses charged, the trial court found that the probative value of the evidence was not outweighed by its prejudicial effect. The trial court noted that the State offered nine separate incidents of domestic violence, five of which were rejected by the trial court. The trial court further commented that the State had proffered 32 potential witnesses, and only 2 of those witnesses would testify regarding the acts of domestic violence. The trial court observed that Livingston and Grammer testified about all nine of the alleged incidents of domestic violence in less than two hours and that the parties indicated the trial would likely last two to three weeks. In light of the circumstances, the trial

---

[1]"In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider: (1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2016).

court concluded that there was little risk of a "mini-trial" regarding the other acts of domestic violence. Both Livingston and Grammer testified at the defendant's trial regarding the acts of domestic violence committed by the defendant.

¶ 15                                      B. The Jury Trial

¶ 16   On February 5, 2016, the defendant arrived at Breanna Livingston's apartment, at approximately 11:30 a.m. Livingston left the apartment to go to work, and the defendant was responsible for watching C.L. and A.L., one of Livingston's other sons, who was a toddler at the time. Livingston testified that before she left for work, C.L. was "perfectly okay." It was the last time Livingston saw C.L. "healthy and happy."

¶ 17   According to the defendant's mother, Gladys Stivers, the defendant contacted her at approximately 12 p.m. The defendant requested that Gladys bring him cigarettes and help take the children to her house. Gladys and her boyfriend, Gary Carrell, took cigarettes to the defendant. When they arrived at Livingston's apartment, Carrell gave the defendant the cigarettes, while Gladys waited in the car. Carrell testified that the defendant requested to speak with Gladys alone. Carrell returned to the car, and Gladys went to the apartment and was with the defendant for 10 to 15 minutes. Thereafter, the defendant and Gladys loaded the children into the car, and everyone returned to Gladys's house.

¶ 18   Livingston's downstairs neighbor, Robert Meek, testified that between 11:30 a.m. and 1:30 p.m., he heard C.L. cry for about half an hour, then stop. After C.L. stopped crying, Meek saw Carrell go up to Livingston's apartment and return downstairs. When Carrell was downstairs, "[h]e grabbed his head and shook it." Gladys then went up to the apartment and subsequently returned downstairs. Meek stated that Gladys and Carrell "talked for a few minutes and they both grabbed their head." Meek further testified that Gladys and Carrell went to

6

Livingston's apartment twice that morning, once at approximately 11 or 11:30 a.m. and again after C.L. stopped crying between 1 and 1:30 p.m. Meek stated that the defendant left Livingston's apartment at 1:30 p.m.

¶ 19    Gladys testified that later that day, while he was at her house, C.L. began shaking, as if he was having a seizure. The defendant called his father, Roger Stivers, at approximately 6:40 p.m. and asked Roger to "come over and take a look" at C.L. After Roger arrived, he observed that C.L. appeared to have difficulty breathing and had a "lazy eye or a wandering eye." Roger and the defendant then took C.L. to Pana Community Hospital in Pana, Illinois. The defendant texted Livingston that she needed to leave work and that he was taking C.L. to the hospital because "hes actin rly [*sic*] weird."

¶ 20    Dr. Demosthenes Asuncion, an emergency room (ER) physician at Pana Community Hospital, observed that C.L. was "limp, nonresponsive, and eyes were deviated to the right." The defendant told Dr. Asuncion that C.L. took a bottle, went down for a nap, and "woke up limp, not acting well." Dr. Asuncion noted that C.L. had no obvious injuries or deformities but remained limp and unresponsive. At the hospital, multiple computed tomography (CT) scans of C.L.'s head, chest, abdomen, and pelvis were performed. The CT scans revealed that C.L. had mild swelling in the brain but no acute bleeding or fluid accumulation. The CT scans also did not reveal any fractures to C.L.'s skull. It was recommended that the CT scans be repeated because the scans were performed in an emergent manner. A nurse also informed Dr. Asuncion that the nurse noticed bruising near C.L.'s jaw.

¶ 21    After Livingston arrived at the hospital, the defendant left. Earlier that day, the defendant had been messaging Katlynn Riley, a 16-year-old girl with whom the defendant had a romantic relationship. Riley testified that on February 5, 2016, she was 16 years old and dating the

defendant, who was 22 at the time. On the day of the incident, Riley and the defendant were messaging each other through Facebook about attending a party later that night. Riley testified that the defendant continued to send her messages about the party after taking his son to the hospital. Later that night, the defendant arrived at the party between 11 p.m. and 12 a.m. and stayed for approximately 30 minutes. Riley testified that the defendant was calm and "shed maybe a couple of tears." While the defendant was at the party, he and Riley French kissed multiple times. Riley testified that, after the defendant left the party, he continued to message Riley through the early morning hours of February 6, 2016. At trial, the State was permitted to introduce the contents of numerous messages between the defendant and Riley from February 2 through February 6, 2016. While the defendant was away from the hospital, Livingston continuously texted the defendant about C.L.'s deteriorating condition.

¶ 22    While Livingston was with C.L., Dr. Asuncion arranged to have C.L. transferred to Cardinal Glennon Hospital in St. Louis, Missouri. A team from Cardinal Glennon subsequently arrived by helicopter and transported C.L. to Cardinal Glennon at approximately 11:30 p.m. On February 6, 2016, the defendant, Livingston, Roger, and Heather Stivers, the defendant's stepmother, traveled to Cardinal Glennon Hospital at approximately 12:47 a.m., arriving between 2 and 3 a.m. While en route to Cardinal Glennon, the defendant sent Riley a message stating, "U [sic] made my nite [sic] with those kisses ***."

¶ 23    Dr. Renee Markowski, an ER pediatrician at Cardinal Glennon, reported that C.L. appeared comatose and his neurologic function was markedly impaired. Dr. Markowski also observed bruises on C.L.'s jaw, chest wall, and abdomen, as well as small red dots around his eyes and face, likely due to increased pressure from crying or force. At Cardinal Glennon, an additional CT scan was performed which showed additional swelling in C.L.'s brain and

8

"pending herniation." Dr. Markowski described pending herniation as the brain being pushed toward the spinal canal as a result of significant swelling. The CT scan also showed that C.L.'s liver was damaged. X-rays performed at Cardinal Glennon revealed multiple fractures to both sides of C.L.'s ribs at different stages of healing. Dr. Markowski noticed C.L. also had acute rib fractures, which suggested the fractures occurred "within the last day or couple days." Dr. Markowski did not observe any patterns in the fractures that would be associated with some metabolic diseases. Finally, C.L. also had bilateral retinal hemorrhages, or bleeding of the retina. Based on the totality of C.L.'s injuries, Dr. Markowski concluded that C.L. had been physically abused and reported that C.L.'s injuries were the result of nonaccidental trauma. Dr. Markowski executed an affidavit indicating that she believed C.L. had been physically abused. The affidavit was given to a social worker who subsequently alerted the police in Pana.

¶ 24    The Pana Police Department requested the assistance of the Illinois State Police to investigate the matter, and Special Agent John Yard was assigned to the case. Initially, investigators interviewed family and household members in Pana, including Gladys, Carrell, and Grammer. Before the police interviewed Gladys, the defendant texted Gladys and asked, "Did u [*sic*] check on [A.L.] make sure he didnt [*sic*] have any ma [*sic*]." Gladys responded, "He has nothing." The defendant told Gladys, "Just dont [*sic*] mix stories stick to what i [*sic*] told u [*sic*] that's [*sic*]." The defendant then said, "Delete this message to [*sic*]." After the police interviewed Gladys, the defendant texted and asked, "Well, what happen?? [*sic*]" Gladys responded, "Waiting for [G]ary," and told the defendant, "Will call [in] a bit." About an hour and a half later, the defendant asked Gladys, "Did u [*sic*] tell them what i [*sic*] did[?]"

¶ 25    After completing the interviews, Agent Yard traveled to the St. Louis area to meet with investigators before traveling to Cardinal Glennon. At Cardinal Glennon, the officers

9

interviewed both Livingston and the defendant. During Livingston's interview, the officers accused Livingston of squeezing and shaking C.L. The officers also measured Livingston's hands and confronted her with photos of C.L. being treated in the hospital. Livingston denied harming C.L., and Trooper Jamie Brunnsworth described Livingston as emotional during the interview.

¶ 26    In the defendant's interview, he admitted to shaking and squeezing C.L. The interview with the defendant was video-recorded and occurred in a conference room in the Pediatric Intensive Care Unit at Cardinal Glennon. In addition to Agent Yard, Trooper Erica Raciak, Sergeant Matt Weller, and an investigator from the Division of Children and Family Services, Antonio Hampton, were present for the interview.

¶ 27    At the beginning of the interview, the defendant was made aware that the interview would be recorded. The defendant gave his permission to be recorded. The defendant was not restrained, and Agent Yard told the defendant that he was not in custody and could leave at any time. The defendant was advised of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and affirmed that he understood those rights. He also initialed and signed a form titled, "Statement of Constitutional Rights and Waiver," which set forth his *Miranda* rights and stated, "I understand what my rights are, and I am willing to answer questions."

¶ 28    The defendant then provided the officers with his account of the previous day, leading up to C.L.'s hospitalization. The defendant stated that he arrived at Livingston's apartment at approximately 11:25 a.m. to watch Livingston's children, including C.L., while Livingston went to work. The defendant claimed that he went to his mother's house with the children approximately a half hour after Livingston left. At his mother's house, the defendant stated that he played with C.L. until C.L. got cranky at around 4 p.m. The defendant reported that he gave

C.L. a bottle, and C.L. fell asleep. C.L. woke up at approximately 6 p.m., and the defendant noticed that C.L. was stiff, grunting and appeared to have trouble breathing. The defendant tried to burp C.L., and C.L. again fell asleep. The defendant went outside to smoke a cigarette, and when the defendant returned to check on C.L., he was grunting and making circular motions with his arms. The defendant called his father, and C.L. was subsequently taken to the hospital.

¶ 29 The questioning then became more accusatory. Agent Yard requested that the defendant tell Agent Yard the truth. Agent Yard also advised the defendant that if he did not want to answer a question, then say, "John, I don't want to answer that question." Agent Yard proceeded to confront the defendant regarding his version of events and the injuries C.L. sustained. The officers also took measurements of the defendant's hands for comparison to the bruises on C.L.'s body. The defendant denied hurting C.L. and claimed that he did not know what caused C.L.'s injuries.

¶ 30 As the interview continued, the defendant informed the officers that he had been questioned by police before, and said, "[Y]ou guys are just gonna [*sic*] keep asking me the same thing over and over until you try to get me to admit something and I'm telling you the truth, everything that I do know." The defendant also indicated that he knew how officers try to get "information out of people by like turning stories around, like, asking several different questions this way and then turn it back the other way." Agent Yard continued to press the defendant about the facts and circumstances of C.L.'s injuries, and the defendant continued to deny knowledge of how C.L. was injured. Agent Yard told the defendant that the officers had measurements of C.L.'s bruises that were consistent with the defendant's fingers. The defendant then stated, "Can I be done answering questions now? Cause you're just asking me the same questions over [*sic*] and I just told you the truth." Sergeant Weller interjected and told the defendant that C.L. was

11

going to die because someone harmed him, and that the defendant should not "act like" he was "being encroached upon."

¶ 31    Agent Yard then reinitiated interviewing the defendant, and the defendant maintained that he did not hurt C.L. Thereafter, the defendant asked if he could see C.L. and talk to Agent Yard alone, but the defendant wanted to first see C.L. Agent Yard responded:

> "I tell you what, since you want to talk to me, let's talk, and I absolutely 100% promise you that we will let you see your son, ok? And what I'll also tell you is that if you promise me that you won't do anything stupid, ok, that I will not handcuff you in front of your family, ok. Is that fair enough?"

The defendant agreed, and Trooper Raciak, Sergeant Weller, and Mr. Hampton left the room.

¶ 32    The defendant continued to maintain that he did not hurt C.L. and moved out of the view of the camera. The defendant also inquired about the charges he might face. When the defendant asked Agent Yard what would happen if the defendant admitted to hurting C.L., Agent Yard responded that he would keep his promise and allow the defendant to see C.L. Agent Yard also told the defendant that he would be arrested. The defendant then inquired about what would happen if he did not admit to hurting C.L. Agent Yard stated that he believed he had enough probable cause to arrest the defendant and would contact the State's Attorney about making an arrest. The defendant then asked Agent Yard to make a deal allowing the defendant to spend the night with Livingston and C.L. and to be arrested the next day. The defendant agreed to tell the truth if Agent Yard could satisfy the defendant's request. Agent Yard stated that he needed to "make a phone call" and paused the recording.

¶ 33    After Agent Yard resumed the interview, he informed the defendant that he could not be arrested the next day or spend the night in the hospital because the hospital staff would not allow

the defendant to stay at the hospital. Agent Yard told the defendant that if he told the truth about what had happened, and promised not to cause any problems, Agent Yard would not arrest the defendant in front of his family and the defendant would be allowed to see C.L. and Livingston. The defendant was also advised that the State's Attorney authorized Agent Yard to arrest the defendant, whether or not he cooperated. The defendant subsequently made inculpatory statements and admitted to squeezing and shaking C.L.

¶ 34    Following the interview, the defendant was allowed to see C.L. and was in C.L.'s room for "maybe two minutes." As the defendant left the room, he encountered Livingston and told her that he was being accused of hurting C.L. Livingston then became angry and loud. She and the defendant were then escorted into a conference room. Livingston testified that she asked the defendant, "[D]id you admit to it because you did it," to which the defendant replied, "[Y]es." Livingston began to cry and scream, and the defendant then claimed, "it was all lies." Livingston was then removed from the room, and the defendant was subsequently arrested.

¶ 35    On February 8, 2016, C.L. died as a result of his injuries. Dr. Jane Turner conducted an autopsy and noted that C.L. had bruising on his face, hemorrhages on the chest wall, bilateral retinal hemorrhages, and a healing rib fracture. C.L. also had blood in his subdural cavity, which indicated a recent injury. Dr. Turner opined that the blood in C.L.'s brain was sufficient to have caused his death. Additionally, C.L.'s brain showed "diffuse axonal injury," which disrupts the brain function. Dr. Turner remarked that diffuse axonal injury and retinal hemorrhaging was the result of acceleration and deceleration, such as in shaking a child's head.

¶ 36    Dr. Channing Petrak, an expert in child abuse pediatrics, examined the medical records and all of the reports regarding the death of C.L., including defense expert witness reports. Dr. Petrak observed that C.L. had sustained multiple rib fractures and opined that the fractures were

13

inflicted over time. Dr. Petrak testified that C.L. clearly sustained a severe head injury, which led to his death. Dr. Petrak did not believe C.L. displayed the presence of rickets, a vitamin D deficiency which causes bones to be less dense.

¶ 37 Dr. Mariateresa Tersigni-Tarrant, a forensic anthropologist, examined C.L. following the autopsy. Dr. Tersigni-Tarrant observed that C.L. had an old, healing fracture to the eleventh rib, which would have required "a lot of force" to cause the fracture. Dr. Tersigni-Tarrant also observed evidence of old fractures on ribs 5, 6, and 7, which were caused by "some trauma to the skeleton." Dr. Tersigni-Tarrant opined that C.L. did not have rickets because evidence of rickets would have been present throughout C.L.'s entire body. Dr. Tersigni-Tarrant testified that she did not rely on X-rays but reached this conclusion because she specifically touched and examined C.L.'s bones. Dr. Tersigni-Tarrant admitted that she did not conduct any testing specifically for the presence of rickets. She explained that she did not do so because C.L. did not show evidence of rickets.

¶ 38 The defense also presented several expert witnesses. Dr. David Ayoub, an expert in the field of radiology and metabolic bone disease, reviewed C.L.'s medical records. Dr. Ayoub testified that after reviewing the records, he believed C.L. had a diagnosis of rickets and that it was possible rickets caused C.L.'s death. Dr. Ayoub posited that rickets is an "alternative answer" to suspected child abuse and had given lectures about rickets on this topic. Dr. Ayoub admitted that he had been criticized by others in the medical profession for this position.

¶ 39 Dr. Kenneth Monson, a professor of mechanical engineering at the University of Utah, also testified for the defense. Dr. Monson opined that a human cannot shake a child to produce the injuries suffered by C.L.

14

¶ 40    Dr. Thomas Young, a forensic pathologist, testified on behalf of the defendant and stated that the bleeding in C.L.'s brain and the retinal hemorrhages were consistent with the cessation of breathing and subsequent resumption of breathing. Dr. Young did not have an opinion as to C.L.'s cause of death.

¶ 41    After the defense rested, the State recalled Dr. Tersigni-Tarrant in rebuttal, who testified that Dr. Ayoub's beliefs regarding rickets as an alternative to child abuse are not generally accepted in the scientific community. Dr. Tersigni-Tarrant stated that rickets manifests throughout the body, not just the individual bones. She further stated that she has never seen a child of C.L.'s age die, directly or indirectly, as a result of rickets.

¶ 42                    E. The Jury's Verdict and Posttrial Proceedings

¶ 43    The jury found the defendant guilty of aggravated battery and first degree murder. The defendant subsequently filed a motion for a new trial alleging, *inter alia*, that the trial court erred in denying the defendant's motion to suppress; erred in allowing the testimony of Kendra Grammer and Breanna Livingston regarding prior acts of domestic violence committed by the defendant; and erred in admitting the messages between the defendant and Katlynn Riley. In ruling on the motion for a new trial, the trial court reaffirmed its previous evidentiary rulings. The trial court remarked that the evidence was not closely balanced and that the defendant's expert witnesses were not credible. The trial court sentenced the defendant to 50 years in the Illinois Department of Corrections. A motion to reconsider the defendant's sentence was denied. This appeal follows.

¶ 44                                    II. ANALYSIS

¶ 45                          A. The Defendant's Motion to Suppress

¶ 46    The defendant contends that the trial court erred in denying his motion to suppress because the officers did not scrupulously honor the defendant's invocation of his right to remain silent. The defendant claims that he invoked his right to remain silent when he stated: "Can I be done answering questions now? Cause you're just asking me the same questions over [*sic*] and I just told you the truth." The defendant also argues that his confession was involuntary because his confession was the product of promises of leniency and was induced by false and misleading evidence.

¶ 47    When reviewing a trial court's ruling on a motion to suppress, we apply the two-part standard adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Absher*, 242 Ill. 2d 77, 82 (2011). Under this standard, we will reverse the trial court's factual findings only if they are against the manifest weight of the evidence. *Absher*, 242 Ill. 2d at 82. We then assess the established facts in relation to the issues presented and may draw our own conclusions in deciding what relief, if any, should be granted. *Absher*, 242 Ill. 2d at 82. Accordingly, we review the ultimate legal question of whether suppression is warranted *de novo*. *Absher*, 242 Ill. 2d at 82.

¶ 48         1. The Defendant's Alleged Invocation of His Right to Remain Silent

¶ 49    The fifth amendment of the United States Constitution and article I, section 10 of the Illinois Constitution guarantee an accused the right against self-incrimination. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. To ensure that the accused is aware of their constitutional

16

right to remain silent, law enforcement is required to provide *Miranda* warnings[2] to the accused prior to interviews. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). If the accused voluntarily agrees to speak with law enforcement, he or she has waived those rights, and law enforcement is free to question the individual. *Davis v. United States*, 512 U.S. 452, 458 (1994). If, however, the accused expresses his desire to remain silent in any manner during an interview, the interview must cease. *Miranda*, 384 U.S. at 473-74.

¶ 50     When an accused invokes his or her right to remain silent, he or she must do so clearly and unambiguously. *Berghuis*, 560 U.S. at 381 (adopting the standard set forth in *Davis v. United States*, 512 U.S. 452, 459 (1994), regarding the invocation of the right to counsel). Whether the alleged invocation is clear and unambiguous is dependent upon how a reasonable police officer would perceive the words of the accused. *Davis*, 512 U.S. at 459. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (Emphasis in original.) *Davis*, 512 U.S. at 459. Accordingly, unless the statement is unambiguous and unequivocal, law enforcement is not required to end the interview or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights. *Berghuis*, 560 U.S. at 381. As the Supreme Court in *Berghuis* explained: "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' " *Berghuis*, 560 U.S. at 382 (quoting *Davis*, 512 U.S. at 461).

---

[2]The *Miranda* warnings provide that the accused has the right to remain silent, anything he or she says may be used against him or her in a court of law, the accused has the right to the presence of counsel, and that, if he or she cannot afford an attorney, one will be appointed prior to any questioning if he or she so desires. *Miranda*, 384 U.S. at 479.

¶ 51　An invocation of the right to remain silent may be made either verbally and/or through conduct that clearly indicates a desire to cease questioning. *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005). Verbal invocations must be specific. *Hernandez*, 362 Ill. App. 3d at 785. Further, the alleged invocation "must be examined in the factual context of its utterance." *People v. Milner*, 123 Ill. App. 3d 656, 660 (1984); see also *People v. Cole*, 172 Ill. 2d 85, 96-97 (1996) (the defendant's statement, "I don't want to talk to you guys," was not an invocation of his right to remain silent, where the surrounding circumstances indicated that the defendant actually meant that he did not want to speak to FBI agents, rather than all law enforcement personnel).

¶ 52　Our analysis of the facts begins with whether the defendant was aware of, and understood, his *Miranda* rights prior to speaking with officers. It is undisputed that the defendant received *Miranda* warnings and voluntarily agreed to speak with officers. The video-recorded interview shows the defendant and Trooper Raciak reviewing the defendant's *Miranda* rights, and the defendant indicated that he understood his rights. The defendant also initialed and signed a form acknowledging those rights and stating that he was willing to answer questions. At the time of his interview, the defendant was 22 years old, finished the twelfth grade, and was able to read and write. The defendant was also familiar with the *Miranda* warnings and his right to remain silent from past experience with law enforcement, in unrelated cases. Thus, the record affirmatively demonstrates that the defendant understood his constitutional rights, including his right to remain silent, and agreed to speak with officers.

¶ 53　Next, we review the defendant's alleged invocation and the overall context of his statement to determine if the defendant unambiguously, and unequivocally, invoked his right to remain silent. At issue is how a reasonable police officer would have perceived the defendant's statement. The defendant claims that he made an unambiguous and unequivocal invocation of his

18

right to remain silent during his interview with officers when he stated: "Can I be done answering questions now? Cause you're just asking me the same questions over [*sic*] and I just told you the truth." Although Agent Yard testified that he did not believe the defendant invoked his right to remain silent, we must construe the defendant's statement from the perspective of a reasonable police officer.

¶ 54    Initially, the interview began with officers gathering background information on the defendant, and he was allowed to tell the officers his version of events. The questioning then became more accusatory as Agent Yard confronted the defendant with information related to C.L.'s injuries and who could have caused the injuries. Agent Yard pressed the defendant to tell Agent Yard what the defendant did, or "who did it." The defendant then mentioned that he had been through police questioning before and believed that the officers would ask the defendant the same questions "over and over" until the defendant made an admission. The defendant also stated that he knew officers would ask questions and attempt to "turn[ ] stories around." Agent Yard continued to press the defendant to tell Agent Yard "who did it" and told the defendant that the officers had eliminated everyone but the defendant. After being told his hand measurements were consistent with C.L.'s injuries, the defendant made his alleged invocation. The defendant did not, however, simply state, "Can I be done answering questions now?" Rather, the defendant qualified this statement by reasserting his belief that the officers were going to ask the defendant the same questions until he admitted to hurting C.L.[3]

¶ 55    The defendant's conduct is also an important consideration in determining whether the defendant invoked his right to remain silent. See, *e.g.*, *People v. Nielson*, 187 Ill. 2d 271, 287

_____

[3]In contrast, a portion of the defendant's interview was suppressed following the defendant's statement, "Can I be done answering questions now," to which Agent Yard replied, "No." Unlike his first alleged invocation, this unqualified statement by the defendant constituted an unambiguous and unequivocal invocation of his desire to cease questioning, which was not scrupulously honored by Agent Yard.

19

(1999) (by putting his hands over his ears, turning his head toward the ceiling, and chanting "nah, nah, nah," the defendant indicated his desire to cease questioning). Here, the defendant was able to respond to questions without confusion, and his demeanor remained largely unchanged throughout the interview. Although the defendant moved out of the camera's view for a portion of the interview, the defendant continued speaking with Agent Yard. Thus, the defendant's conduct, much like his words, did not demonstrate that he wished for questioning to end.

¶ 56 Viewing the defendant's alleged invocation in the context of its utterance, the defendant's statement was not unambiguous and unequivocal because the defendant's statement was not a request to terminate questioning. Rather, the defendant's statement indicated that he was frustrated with the questions being asked. A reasonable officer, under the circumstances, could have perceived the defendant's statement as an indication that he did not want to be asked the same questions, but would answer other questions that might be posed. Therefore, the defendant's statement was not a clear and unequivocal invocation of his right to remain silent.

¶ 57          2. The Voluntariness of the Defendant's Inculpatory Statements

¶ 58 We look next at whether the defendant's statements were voluntary. The test for determining whether the defendant's confession was voluntarily made is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed. *People v. Slater*, 228 Ill. 2d 137, 160 (2008). In making this determination, a court must consider the totality of the circumstances of the particular case, including: (1) the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; (2) the legality and duration of the detention; (3) the presence of *Miranda* warnings; (4) the duration of questioning; and (5) any physical or mental abuse by law enforcement, which includes the

20

presence of threats or promises. *People v. Richardson*, 234 Ill. 2d 233, 253-54 (2009). Courts may also consider the investigator's fraud, deceit, or trickery in obtaining a confession. *People v. Bowman*, 335 Ill. App. 3d 1142, 1153 (2002). No single factor is dispositive. *Richardson*, 234 Ill. 2d at 253. Here, the defendant claims that his confession was involuntary because his confession was the product of a promise of leniency and induced by false and misleading evidence.

¶ 59    A confession may be found involuntary if it was the product of promises or suggestions of leniency. *People v. Ruegger*, 32 Ill. App. 3d 765, 771 (1975). To constitute a promise a leniency, such a statement must be coupled with a suggestion of a specific benefit which would follow if the defendant confessed. *People v. Eckles*, 128 Ill. App. 3d 276, 278 (1984). Mere exhortations to tell the truth or to make a statement, however, do not render a subsequent confession inadmissible. *People v. Wipfler*, 68 Ill. 2d 158, 173 (1977). Even if a promise or suggestion of leniency has been made, a confession is not *per se* inadmissible. *People v. Johnson*, 285 Ill. App. 3d 802, 807-08 (1996).

¶ 60    During the defendant's interview, Agent Yard promised the defendant that he could see C.L. and not be arrested in front of the defendant's family if the defendant told the truth. The defendant claims that these were promises of leniency. Leniency, however, implies that the defendant would receive some specific benefit regarding his or her case in exchange for a confession. See, *e.g.*, *Ruegger*, 32 Ill. App. 3d at 771 (statement held involuntary where police officer, who was a relative of the defendant, told the defendant that the officer would "go to bat" for the defendant on such matters as recognizance bond and probation if he confessed); *People v. Shaw*, 180 Ill. App. 3d 1091, 1093 (1989) (confession held involuntary when police officer told the defendant that "he could *** probably get help through the courts"); *People v. Travis*, 2013 IL App (3d) 110170, ¶¶ 19, 66 (juvenile defendant's confession held involuntary where police

21

officer told the defendant that everyone "gets a clean slate when they turn 17" and that the defendant must take responsibility for his actions in order to get "those chances"). The two promises made by Yard, however, did not suggest, in any way, that the defendant would receive any benefit related to his case. We also note that Agent Yard repeatedly advised the defendant throughout the interview that Agent Yard could not make any "deals" with the defendant. Thus, the promises to see C.L. and not be arrested in front of his family did not constitute promises of leniency.

¶ 61    The defendant also argues that his confession was involuntary because the officers presented the defendant with false and misleading evidence. At trial, Agent Yard admitted that he lied to the defendant several times during the defendant's interview at Cardinal Glennon. Specifically, Agent Yard told the defendant that they had eliminated everyone else as a suspect; that the doctors had measured the bruises on C.L., which matched the defendant's hand measurements; and that the officers would be able to get fingerprint impressions from C.L.'s body. If the police make false or misleading representations to the defendant regarding the evidence, such representations, while relevant to voluntariness, are insufficient to make an otherwise voluntary confession inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (police misrepresentations of statements by codefendant, while relevant, were insufficient to show involuntariness); see also *People v. Kashney*, 111 Ill. 2d 454, 465-67 (1986) (assistant state's attorney made false statements to a suspect that his fingerprints were found all over the scene of the crime); *People v. Melock*, 149 Ill. 2d 423, 450 (1992) (polygraph technician falsely told the defendant that he failed the polygraph test); and *People v. Martin*, 102 Ill. 2d 412, 427 (1984) (police falsely told the defendant that he had been identified by a witness as the "triggerman").

22

Although deception by law enforcement weighs against a finding of voluntariness, it is only one of many factors to be weighed in determining voluntariness. *Melock*, 149 Ill. 2d at 450.

¶ 62    In determining whether the defendant's confession was voluntary, we must consider the totality of the circumstances. As previously set forth, the defendant was provided *Miranda* warnings prior to his interview with officers and affirmed that he understood his rights. The defendant also initialed and signed the form acknowledging his rights, which also stated that he was willing to answer questions. At the time of the interview, the defendant was 22 years old, finished the twelfth grade, and was able to read and write. The defendant responded to questions without confusion and his demeanor remained largely unchanged throughout the interview, which lasted approximately 1 hour and 55 minutes, with an 18-minute break. The interview occurred in a hospital conference room, and the defendant was not restrained or subjected to any physical punishment. The defendant also had a history with law enforcement and had been questioned numerous times in prior, unrelated cases. In one of those cases, the defendant was read his *Miranda* rights and questioned about whether he was driving a truck that fled from an officer. The defendant did not confess, and no charges were ever filed against the defendant for that incident.

¶ 63    Considering that Agent Yard made two promises, although not promises of leniency, and lied to the defendant, we do not find that the defendant's confession was involuntary. Regarding the promises, the defendant was not promised anything in exchange for a confession. Rather, the defendant promised to tell the truth. Furthermore, although he testified at the motion to suppress hearing about the promises made, the defendant never testified that these promises induced him to make inculpatory statements. Finally, we find that Agent Yard's conduct as a whole was not

so fraught with deception as to render the defendant's statement untrustworthy. In light of the totality of the circumstances, we conclude that the defendant's confession was voluntarily made.

¶ 64    In sum, we find that the trial court did not err in denying the defendant's motion to suppress regarding his alleged invocation of his right to remain silent and the voluntariness of his confession. Finding no error in the trial court's rulings, we need not address the parties' arguments as to whether the admission of the defendant's confession at trial constituted harmless error.

¶ 65              B. Admissibility of Other Acts of Domestic Violence

¶ 66    The defendant next argues that the trial court abused its discretion by allowing the State to introduce at trial the testimony of Breanna Livingston and Kendra Grammer regarding other acts of domestic violence committed by the defendant. The defendant contends that the probative value of this "other crimes" evidence was substantially outweighed by its prejudicial effect. We disagree.

¶ 67    The admissibility of other crimes evidence is within the sound discretion of the trial court, and we will not disturb its decision on this matter absent a clear abuse of discretion. *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010). A trial court abuses its discretion when its decision is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view. *People v. Ward*, 2011 IL 108690, ¶ 21. "Reasonable minds can differ about whether such evidence is admissible without requiring reversal under the abuse of discretion standard." *People v. Donoho*, 204 Ill. 2d 159, 186 (2003).

¶ 68    Other crimes evidence, or prior acts evidence, includes criminal acts as well as other misconduct and bad acts that may not rise to the level of a criminal offense. *People v. McSwain*, 2012 IL App (4th) 100619, ¶ 35. It is well-settled under the common law that other crimes

24

evidence is admissible, if relevant, for any purpose other than to show a defendant's propensity to commit a crime. *People v. Chapman*, 2012 IL 111896, ¶ 19. Such relevant purposes include motive, intent, identity, lack of mistake, and *modus operandi*. *Chapman*, 2012 IL 111896, ¶ 19. This common law rule was partially abrogated by section 115-7.4 of the Code of Criminal Procedure of 1963, which provides as follows:

> "In a criminal prosecution in which the defendant is accused of an offense of domestic violence *** or first degree murder ***, evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2016).

Thus, under section 115-7.4, other crimes evidence may be introduced for any relevant purpose, including to establish the defendant's propensity to commit the charged offense.

¶ 69    As with any evidence, the trial court must still balance the probative value of the proffered evidence against any undue prejudice to the defendant. 725 ILCS 5/115-7.4(b) (West 2016). "Undue prejudice" within the meaning of section 115-7.4(b) necessarily means prejudice, other than that resulting from proof of the defendant's propensity to commit domestic violence, because the very purpose of section 115-7.4 is to lift the common law ban on that particular kind of propensity evidence. *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 77. In balancing the probative value of other crimes evidence against undue prejudice to the defendant, the trial court may consider: (1) the proximity in time to the charged offense, (2) the degree of factual similarity to the charged offense, or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.4(b) (West 2016).

¶ 70    Here, the defendant disputes the admission of four acts of domestic violence: (1) the defendant physically punishing M.L. for spilling food, (2) the defendant breaking down the door

of Livingston's apartment, (3) the defendant throwing a baby bottle at Livingston's head with enough force to cause a hole in the wall, and (4) the defendant locking Livingston in her apartment, exerting physical force on Livingston, and removing the battery from her phone. The defendant does not dispute that these incidents were acts of domestic violence or that the acts were close in time to the offenses charged. Rather, the defendant only asserts that this evidence was not factually similar to the charged conduct.

¶ 71    As factual similarities increase, so does the relevance or probative value of the evidence. *People v. Smith*, 406 Ill. App. 3d 747, 753 (2010). Conversely, as the number of dissimilarities increase, so does the prejudicial effect of other crimes evidence. *Smith*, 406 Ill. App. 3d at 754. But the existence of some differences between the evidence and the charged conduct does not defeat admissibility. *Smith*, 406 Ill. App. 3d at 753-54. Indeed, to be admissible under section 115-7.4, the other crimes evidence must bear merely "general similarity" to the charged offense. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 43.

¶ 72    Regarding the incident involving M.L., this evidence bore a general similarity to the charged conduct because it involved the defendant's violent reaction to the behavior of young children. In response to M.L. spilling food, the defendant physically punished M.L. by placing the child's hand on the edge of a table and repeatedly striking M.L.'s hand with a closed fist, causing him to cry. Furthermore, the defendant was acting in a parental role when he committed this act.

¶ 73    The three incidents involving Livingston also bore a general similarity to the charged conduct. In each instance, the defendant reacted violently to the mother of his child "when things did not go his way." The defendant broke down Livingston's apartment door during an argument after Livingston locked the defendant out of the apartment. At the time of this incident,

26

Livingston was pregnant with C.L. The defendant threw a baby bottle at Livingston while she held C.L. because Livingston attempted to soothe C.L. when the defendant believed C.L. should "cry it out." The bottle missed Livingston's head but was thrown with enough force to cause a hole in the wall. During another argument, the defendant locked Livingston inside her apartment, exerted physical force against Livingston when she tried to escape, and removed the battery from Livingston's phone. The defendant argues that these incidents are not similar to the charged offenses because the incidents involved an adult, rather than C.L. or a child, and did not involve physical violence inflicted upon another person. To be admissible, however, the acts of domestic violence do not necessarily need to be targeted at the alleged victim, or someone of a similar age, or involve the use of force against a person. See, *e.g.*, *People v. McCarthy*, 132 Ill. 2d 331, 343-44 (1989) (finding that prior bad act of smashing the car windows of the victim's family member tended to show the defendant's intent to harm the victim).

¶ 74    The admission of other crimes evidence against the defendant is, naturally, prejudicial to some extent. Therefore, when admitting other crimes evidence, the trial court "must admit only so much evidence as is reasonably necessary to establish propensity," and it is the trial court's "responsibility to control the presentation of evidence in a manner that minimizes juror confusion and promotes judicial economy." *Smith*, 406 Ill. App. 3d at 756. The evidence of other crimes must not become a focal point of the trial, nor should the trial become a mini-trial of the other crimes evidence. *Smith*, 406 Ill. App. 3d at 755. A mini-trial occurs when the propensity evidence was "so overabundant as to 'cause jury confusion or unnecessary delay.' " *Kelley*, 2019 IL App (4th) 160598, ¶ 110 (quoting *People v. Walston*, 386 Ill. App. 3d 598, 620 (2008)).

¶ 75    Here, the record establishes that no mini-trial occurred. The evidentiary portion of the defendant's trial spanned seven days with 27 different witnesses testifying. Only 2 of the 27

witnesses, Livingston and Grammer, testified regarding the other crimes evidence. Thus, the other crimes evidence was not the focus of the trial and did not invite the jury to conduct a mini-trial concerning the acts of domestic violence. See, *e.g.*, *People v. Null*, 2013 IL App (2d) 110189, ¶¶ 44-45 (finding other crimes evidence was not the focus of the trial, nor did a mini-trial occur, when the other crimes evidence was "targeted and brief" and accounted for only 250 pages of the trial record compared to 1200 pages regarding the charged conduct).

¶ 76 Accordingly, the trial court did not abuse its discretion in finding that the probative value of the four acts of domestic violence was not substantially outweighed by any undue prejudice to the defendant. Each act of domestic violence demonstrated the defendant's propensity for committing acts of domestic violence against those close to him, including children. The evidence also showed that the defendant had the ability to form the requisite intent to commit acts of domestic violence and that the charged conduct was not accidental. Finding no error in the trial court's ruling, we need not address the defendant's contention that the admission of the other acts of domestic violence did not constitute harmless error.

¶ 77                     C. Facebook Message Evidence

¶ 78 Finally, the defendant contends that Facebook messages between the defendant and Katlynn Riley, from February 2 through February 4, 2016, were improperly admitted because the messages were not relevant to prove the offenses charged. The State responds by arguing that the messages were relevant to show the defendant's state of mind in the days leading up to, and the day of, C.L.'s injuries and to demonstrate a timeline of events. The State also notes that the trial court provided a limiting instruction regarding this evidence prior to its admission.

¶ 79 Before we address the defendant's arguments regarding the trial court's evidentiary ruling, we must first determine the appropriate standard of review. The defendant suggests that

28

this court may review the trial court's evidentiary ruling *de novo* because the facts are not in dispute and only the legal relevance of the messages is being challenged.

¶ 80 Generally, reviewing courts review a trial court's evidentiary rulings for an abuse of discretion rather than *de novo*. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). We may apply *de novo* review, however, where the trial court's exercise of discretion has been frustrated by an erroneous error of law. *Caffey*, 205 Ill. 2d at 89. Here, the trial court's decision on whether to allow the State to introduce the challenged messages was purely evidentiary, and it is within the sound discretion of the trial court to decide whether evidence is relevant and admissible. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). In *Caffey*, our supreme court explained that: "The decision whether to admit evidence cannot be made in isolation. The trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice." 205 Ill. 2d at 89. Accordingly, we will review the trial court's ruling for an abuse of discretion.[4] A trial court abuses its discretion when its decision is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view. *Caffey*, 205 Ill. 2d at 89.

¶ 81 We now turn to the merits of the defendant's contention. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). A trial court may reject offered evidence as irrelevant if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004).

---

[4]The defendant's reliance on *People v. Ramos*, 396 Ill. App. 3d 869 (2009), for a *de novo* standard of review is misplaced because the court in *Ramos* applied the *de novo* standard to a trial court's comments to the jury that arguably impacted the defendant's right to a fair trial. *Ramos*, 396 Ill. App. 3d at 878-79.

29

¶ 82    At trial, the State introduced messages between the defendant and Riley from February 2 through February 6, 2016, to show the defendant's state of mind on February 5, 2016. Specifically, the State intended to show that the defendant was more concerned about attending a party than the well-being of his child and that kissing Riley, while his son was dying in the hospital, was the highlight of the defendant's night. The messages prior to February 5, however, only showed that Riley and Livingston worked together and did not get along; that the defendant called Livingston a "b***"; that the defendant and Riley planned to see each other; and that they were involved in a relationship and discussed things such as drinking and cuddling. The State offers little explanation for how these messages were relevant to show the defendant's state of mind on February 5. The State only argues that these messages show that the defendant was messaging Riley within 72 hours of the day of C.L.'s injuries and at a time when the defendant was responsible for watching C.L. and Livingston's other children. We are not persuaded by the State's position. The challenged messages from February 2 through February 4 have little to do with the events that occurred on February 5, 2016. Thus, the messages were irrelevant to show the defendant's state of mind.

¶ 83    The State also suggests that the Facebook messages from February 2 through February 4 were relevant to demonstrate a timeline because the messages provided a background to the events immediately surrounding the offenses charged. We do not agree with the State's position. As previously noted, the contents of the challenged messages merely established that the defendant and Riley were messaging and involved in a romantic relationship, not a background to the events immediately surrounding the charged conduct.

¶ 84    While we agree with the defendant that the messages from February 2 through February 4 were irrelevant to prove the offenses charged, the admission of these messages was, nonetheless,

harmless. An error is harmless if it appears beyond a reasonable doubt that the error did not contribute to the verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). To determine whether an error was harmless, a reviewing court may take three different approaches: (1) focusing on the error to determine if it contributed to the conviction, (2) analyzing the other evidence in the case to determine whether that evidence overwhelmingly supported the defendant's conviction, or (3) determining whether the improperly admitted evidence was merely cumulative or duplicative of the other properly admitted evidence. *Patterson*, 217 Ill. 2d at 428.

¶ 85    Here, the evidence against the defendant was overwhelming. The defendant admitted to shaking and squeezing C.L. because C.L. would not stop crying. The defendant also sent incriminating text messages to his mother, suggesting that he harmed C.L. The evidence also showed that the defendant had a violent temper and committed other acts of domestic violence, including one instance against a child. Finally, several medical experts testified regarding the severity and cause of C.L.'s injuries, namely child abuse.

¶ 86    The erroneously admitted messages were also merely cumulative of the messages from February 5 through February 6, which the defendant has not challenged. The defendant's primary complaint on appeal is that the messages from February 2 through February 4 portrayed the defendant as a bad person who was unfaithful to the mother of his child and pursuing an inappropriate, romantic relationship with a 16-year-old girl. The messages between the defendant and Riley from February 5 to February 6 were also admitted into evidence. In these messages, the defendant and Riley discussed hanging out, and the defendant told Riley "U [*sic*] made my nite [*sic*] with those kisses ***." The jury also heard testimony from Riley about her relationship with the defendant and her interactions with the defendant while C.L. was in the hospital. From Riley's testimony, as well as the February 5 and February 6 messages, the jury could have drawn

31

the same conclusion about the defendant that he complains of now on appeal, that he was unfaithful to the mother of his child and pursing an inappropriate, romantic relationship with a 16-year-old girl.

¶ 87　In light of the overwhelming evidence presented at the defendant's trial and the fact that the February 2 through February 4 messages were merely cumulative, we find that the admission of these messages was harmless error. Even absent these messages, the evidence at trial strongly supported the defendant's conviction.

¶ 88　　　　　　　　　　　　III. CONCLUSION

¶ 89　In sum, the judgment of the trial court concerning the defendant's motion to suppress and the evidence of other acts of domestic violence is affirmed. Although the trial court abused its discretion in admitting the Facebook messages between the defendant and Riley from February 2 through February 4, 2016, this error was harmless. Accordingly, we affirm the judgment of the trial court and the defendant's convictions.

¶ 90　Affirmed.